## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **JEFFERY CARLOS HALE, et al.,** | ) | |
|     **Plaintiffs** | ) | |
| | ) | **REPORT AND** |
| **v.** | ) | **RECOMMENDATION** |
| | ) | |
| **CNX GAS COMPANY, LLC,** | ) | **Case No. 1:10cv00059** |
| **et al.,** | ) | |
|     **Defendants** | ) | |

This case comes before the court on defendants' motions to dismiss, (Docket Item Nos. 29, 35, 49) ("Motions"). The Motions are before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The Motions were argued before the undersigned on January 18, 2011. As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

### I. Facts and Procedural History

The plaintiff, Jeffery Carlos Hale, sues on behalf of himself and others similarly situated. Hale sues CNX Gas Company, LLC, ("CNX"), Torch Oil & Gas Company, ("Torch"), and certain unknown coal estate owners, named as John Does A-Z. The Complaint alleges that Hale and the class members own certain gas estate interests in coalbed methane, ("CBM"), gas fields in Buchanan, Russell and Tazewell counties in Virginia, and are entitled to payments from CNX as "deemed" lessors under forced-pooling orders of the Virginia Gas and Oil Board, ("Board"). Hale is a resident of

North Carolina, and states that he is the owner of lands and gas interests, including CBM, in Buchanan County.

CBM is a natural gas that resides in coal seams.  Because CBM is combustible when it accumulates in certain concentrations, coal mines, including those throughout Southwest Virginia, historically have ventilated or otherwise removed CBM into the atmosphere as a safety measure.  During the 1970s, technological advances made the commercial capture and sale of CBM feasible, and CBM wells began to be drilled. In 1990, the Virginia General Assembly enacted the Virginia Gas and Oil Act, VA. CODE ANN. §§ 45.1-361.1, et seq., ("Gas Act"). When the Gas Act was enacted, there was uncertainty in Virginia as to whether CBM was owned by landowners who retained rights to the gas estate/interest or by those who owned the coal estate/interest in the land.  The Gas Act facilitated the drilling and production of CBM, without waiting for the CBM ownership issue to be decided, by allowing for the forced-pooling of CBM interests with conflicting claims of ownership into drilling units.

The Gas Act created the Board and authorized it to enter orders pooling all interests or estates into CBM drilling units and appointing gas well operators to drill for and produce CBM from these units. *See* VA. CODE ANN. §§ 45.1-361. 21, 45.1-361.22 (2002 Repl. Vol. & Supp. 2010).  In drilling units where there are conflicting claims of ownership of the CBM or where the owners of the CBM are unknown or cannot be located, the Gas Act requires the gas well operators to deposit any funds due to these interests into escrow, to be held pending identification and location of the owner or a final agreement or determination as to ownership of the CBM estate/interest.  *See* VA. CODE ANN. §§ 45.1-361.21, 45.1-361.22.

The Complaint alleges that CNX began producing and selling CBM in Southwest Virginia in the 1990s. It alleges that CNX's operations in Southwest Virginia are extensive, with more that 3,200 CBM wells resulting in the production, marketing and sale of millions of cubic feet of CBM by CNX in 2009.

CNX asserts that Hale's alleged gas interests were forced-pooled by the Board by five separate pooling orders. CNX has filed copies of the Board's pooling orders for each of these five wells.(Docket Item No. 30, Atts. 2-6.) In Board Docket No. 99-0216-0709, Pocahontas Gas Partnership, ("Pocahontas"), a predecessor in interest to CNX, filed an application to place a CBM gas well, FF-23, on an approximately 80-acre drilling unit. (Docket Item No. 30, Att. 2.) At the time of its application, Pocahontas represented that it had CBM leases from 79.39502 percent of the fee owners for this tract. Following a hearing, the Board, by Report Of The Board Findings and Order approved on September 30, 1999, granted the application and approved the well and the pooling of all interests in the drilling unit. The order stated in part:

> Relief Granted: The Operator's requested relief in this cause be and hereby is granted: (1) Pursuant to Va. Code § 45.1-361.21.C.3, [Pocahontas] ... is designated as the Unit Operator authorized to drill and operate Coalbed Methane Gas well in Subject Drilling Unit ..., and (2) all the interests and estates in and to the Gas in Subject Drilling Unit, including that of the Applicant and of the known and unknown persons listed on Exhibit B-3, attached hereto and made a part hereof, and their known and unknown heirs, executors, administrators, devisees, trustees, assigns and successors, both immediate and remote, be and hereby are pooled in the Subject Formation in the Subject Drilling Unit underlying and comprised of the Subject Lands.

The order, in paragraphs 8 and 9, gave any gas owner who had not reached a voluntary agreement with Pocahontas 30 days to elect among three options: (1) to be a participating operator; (2) to be a nonparticipating operator; or (3) to be a nonparticipating lessor. The order further recognized that any gas owner who did not elect one of these options within the required time period "shall be deemed, subject to final legal determination of ownership, to have elected to accept as satisfaction in full for such person's right, interests, and claims in and to the Gas" a $1 per acre annual cash bonus beginning from the date of the order and continuing until commencement of production and thereafter a royalty of 1/8th of the net proceeds multiplied by that person's proportional interest within the unit. The order stated that these gas owners "shall be deemed to have leased and/or assigned [their] right[s], interests, and claims in and to the Gas produced ... to the Unit Operator."

The order recites that the estimated cost to bring this well to production would be $235,445.14. It further recites that the estimated production over the life of this well would be 125 to 550 million cubic feet of CBM.

The order further provided that any funds due any unknown or unlocatable persons should be placed in escrow along with any funds due for gas taken where there were "conflicting claims" of ownership of the gas estate. The order states: "Such funds shall be held for the exclusive use of, and sole benefit of the person entitled thereto until such funds can be paid to such person(s) or until the Escrow Agent relinquishes such funds as required by law or pursuant to Order of the Board." The order requires payments into escrow be made on a monthly basis.

Without stating what, if any, evidence was presented or considered on the issue, the order states:

> Special Findings: The Board specifically and specially finds:
> ...Applicant's evidence established that the fair, reasonable and equitable compensation to be paid to any person in lieu of the right to participate in any well covered hereby are those options provided in Paragraph 9 above. ...

Hale is specifically listed in this order as having an ownership interest in one of the tracts of land covered by the order.

Another portion of Hale's land is included in the Board's pooling order in Docket No. 00-1017-0830. In this application, Pocahontas sought to place a CBM gas well, FF-24, on an approximately 80-acre drilling unit. (Docket Item No. 30, Att. 3.) At the time of its application, Pocahontas represented that it owned 14.99608 percent of the acreage of the unit in fee. Following a hearing, the Board, by Report Of The Board Findings and Order approved on December 11, 2000, granted the application and approved the well and the pooling of all interests in the drilling unit. The Board's order in this case contained the same language as outlined above. The order also recited that the estimated cost to bring this well to production would be $233,195.43, and the estimated lifetime production of this well would be 125 to 550 million cubic feet of CBM. Hale is specifically listed in this order as having an ownership interest in two of the tracts of land covered by the order.

Another portion of Hale's land is included in the Board's pooling order in

Docket No. 00-1017-0826. In this application, Pocahontas sought to place a CBM gas well, EE-24, on an approximately 80-acre drilling unit. (Docket Item No. 30, Att. 4.) At the time of its application, Pocahontas represented that it had CBM leases from the fee owners of 20.4875 percent of the acreage of the unit. Following a hearing, the Board, by Report Of The Board Findings and Order approved on December 11, 2000, granted the application and approved the well and the pooling of all interests in the drilling unit. The Board's order in this case contained the same language as outlined above. The order also recited that the estimated cost to bring this well to production would be $240,502.43, and the estimated lifetime production of this well would be 125 to 550 million cubic feet of CBM. Hale is specifically listed in this order as having an ownership interest in one of the tracts of land covered by the order.

Another portion of Hale's land is included in the Board's pooling order in Docket No. 00-1017-0831. In this application, Pocahontas sought to place a CBM gas well, FF-25, on an approximately 80-acre drilling unit. (Docket Item No. 30, Att. 5.) At the time of its application, Pocahontas represented that it had CBM leases from the gas owners of 20.96720 percent of the acreage of the unit. Following a hearing, the Board, by Report Of The Board Findings and Order approved on December 11, 2000, granted the application and approved the well and the pooling of all interests in the drilling unit. The Board's order in this case contained the same language as outlined above. The order also recited that the estimated cost to bring this well to production would be $243,993.93, and the estimated lifetime production of this well would be 125 to 550 million cubic feet of CBM. Hale is specifically listed in this order as having an ownership interest in one of the tracts of land covered by the order.

Another portion of Hale's land is included in the Board's pooling order in

Docket No. 01-0116-0852. In this application, Pocahontas sought to place a CBM gas well, AV-111, on an approximately 80-acre drilling unit. (Docket Item No. 30, Att. 6.) At the time of its application, Pocahontas represented that it owned in fee or had CBM leases from the gas owners for 97.6031 percent of the acreage of the unit. Following a hearing, the Board, by Report Of The Board Findings and Order approved on March 2, 2001, granted the application and approved the well and the pooling of all interests in the drilling unit. The Board's order in this case contained the same language as outlined above. The order also recited that the estimated cost to bring this well to production would be $209,680.79, and the estimated lifetime production of this well would be 125 to 550 million cubic feet of CBM. Hale is specifically listed in this order as having an ownership interest in one of the tracts of land covered by the order.

Hale claims that, for years, CNX, as the operator of CBM wells/units located throughout Southwest Virginia, has produced and sold substantial quantities of CBM that are attributable to Hales's and the class members' gas ownership interests and has never properly accounted for it. Hale claims that CNX instituted proceedings before the Board under the Gas Act that have resulted in orders that pooled all interests or estates into CBM drilling units, appointed CNX as operator of the CBM units and "deemed" that Hale and the class members had leased their CBM interests in the units to CNX. Hale claims that CNX repeatedly asserted that there were conflicting CBM ownership claims as between the gas estate owners and the coal estate owners, allowing CNX to place the proceeds attributable to his and the class members' interests into escrow pending a judicial resolution of the conflicting claims. The Complaint alleges that the amount in controversy between the named parties is in

excess of $75,000.00 and between the defendants and the class is in excess of $5 million.

Hale claims that, under the language of the Gas Act and the Board's orders, the "deemed leases" were conditionally imposed upon the class members "subject to a final legal determination of ownership." *See* VA. CODE ANN. § 45.1-361.22(6) (2002 Repl. Vol. & Supp. 2010). Hale seeks judgment as to the ownership of the CBM in the wells/units operated by CNX, declaring the "deemed leases" void and awarding the class members all of the revenues – or 8/8ths of the revenue – from the CBM wells, net CNX's proper operating expenses. Hale also claims that, under the Gas Act, CNX is a "participating operator" and, as such, is required to pay all CBM proceeds, net its proper operating expenses, into escrow.

On behalf of all class members, Hale also seeks a full and accurate disclosure and accounting of CNX's handling and marketing of the CBM taken from any wells involving "deemed leases" under Board orders under the Act. Hale further argues that, if the Gas Act and the Board's orders are interpreted to allow the "deemed leases" to remain in place after a final determination of ownership in exchange for payment of only a 1/8th royalty, the Gas Act is unconstitutional in that the class members' property has been taken for a private use and because their property has been taken without just compensation.

The court's jurisdiction is based on both a federal question and diversity of citizenship. *See* 28 U.S.C.A. §§ 1331, 1332(a)(1), 1332(d)(2)(A) (West 2006). Hale seeks, on behalf of himself and the class members, a judgment pursuant to 28 U.S.C.

§ 2201 against CNX and the coal owners, declaring that:

1. Hale and the class members are owners of the CBM that is attributable to those tracts on which CNX asserts that there are conflicting claims of CBM ownership between gas estate owners and coal estate owners;

2. CNX, as the CBM unit operator, must account to Hale and the class members as unleased mineral owners for all proceeds, net of operational expenses, for past and future production from these CBM wells;

3. All proceeds attributable to Hale's and the class members' CBM interests must be released from escrow;

4. CNX must provide an accounting of the revenues from these CBM units and of the escrowed funds; and

5. If the "deemed leases" provision of the Gas Act are interpreted to limit Hale and the class members to recovery of only a 1/8th royalty, that the Gas Act is unconstitutional because it allows a taking of private property for private use and without adequate and just compensation.

The Complaint also asserts claims against CNX for trespass, conversion, negligence, breach of fiduciary duties, unjust enrichment, punitive damages and attorneys' fees.

CNX moves for the court to dismiss plaintiffs' claims for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), for failing to state a claim

under Federal Rule of Civil Procedure 12(b)(6) and for failing to join all necessary parties under Federal Rule of Civil Procedure 12(b)(7), (Docket Item No. 29) ("CNX's Motion"). Torch joins CNX's Motion, (Docket Item No. 35) ("Torch's Motion"). The Commonwealth of Virginia has intervened in this matter and moved that the court dismiss Hale's constitutional claim and his claim to his proportional share of 8/8ths of the net revenues from these CBM wells. (Docket Item No. 49) ("Commonwealth's Motion").

At the January 18, 2011, hearing, counsel for Torch informed the court that Torch owned the coal rights to the tracts at issue and that Torch had entered voluntary leases with CNX to produce the CBM from these tracts for a 1/8th royalty.

## II. Analysis

I first will address the defendants' request to dismiss the Complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). The defendants argue that this court lacks jurisdiction over Hale's claims because Hale has failed to exhaust his administrative remedies under the Gas Act. In particular, the defendants claim that Hale's claims are simply challenges to the relevant Board pooling orders – orders which were entered in 1999, 2000 and 2001, and which Hale concedes he did not appeal. The defendants argue that Hale's failure to appeal these orders to the circuit court as provided by Virginia Code § 45.1-361.9 forever prevents him from challenging the validity of these orders. *See Va. Chapter, Associated Gen. Contractors of Am., Inc. v. Kreps,* 444 F. Supp. 1167, 1179 (W.D. Va. 1978).

While that may be the case, Hale's counsel state unequivocally that they are not challenging the validity of the state's authority through the Board to enter pooling orders. Instead, they assert that Hale seeks judgment for himself and others similarly situated that they, and not the coal owners, own the CBM rights at issue – an issue that the Board has no authority to decide. *See* VA. CODE ANN. § 45.1-361.22(5) (Board may order payments out of escrow only after determination of ownership of CBM by a court of competent jurisdiction). Once ownership is established, Hale seeks a further declaratory judgment that, under the Gas Act and the pooling orders, he and similarly situated "deemed" lessors, would be entitled to 8/8ths of the net proceeds from these wells. Should the court disagree with his interpretation of the Gas Act and the Board's pooling orders, Hale seeks judgment that the Gas Act is an unconstitutional taking.

Clearly, this court has federal question jurisdiction to determine the constitutionality of the Gas Act. *See* 28 U.S.C.A. § 1331. Based on the allegations contained in the Complaint, the court also may determine the CBM ownership issue between the named parties or as a class action under its diversity jurisdiction, *see* 28 U.S.C.A. §§ 1332(a)(1), 13332(d)(2)(A). The court also has diversity jurisdiction over Hale's state law tort claims against CNX. *See* 28 U.S.C.A. § 1332(a)(1). Furthermore, the court also has jurisdiction pursuant to 28 U.S.C. § 2201 to issue declaratory judgments in cases of actual controversy.

Based on Hale's representation that he does not attack the validity of the Board's pooling orders, the court may not, and will not, address that issue. That does not mean, however, that this court does not have jurisdiction to interpret and declare the meaning of the Gas Act and the Board's orders entered pursuant to the Gas Act.

As discussed below at greater length, I cannot find that the Gas Act was intended to preempt common law tort claims a CBM royalty owner may have against a producer. Therefore, I recommend that the court deny the Motions insofar as they seek dismissal of the Complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

I will next address the defendants' request to dismiss the Complaint for failure to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6). The defendants argue that the Gas Act, as enacted, and as applied, is constitutional. Specifically, the defendants argue that the Complaint fails to state a claim for 8/8ths of the CBM wells' net revenues. CNX also argues that, insofar as Hale seeks payments contrary to the Board's pooling orders, those claims are barred by his failure to exhaust his statutory appeals of those orders. CNX further argues that a number of claims raised by Hale are not recognized by Virginia law or are not supported by the allegations contained in the Complaint; these include the claims for trespass, conversion, negligence, breach of fiduciary duties, unjust enrichment and punitive damages.

The Supreme Court recently revisited the proper standard of review for a motion to dismiss and stated that the long-used "no set of facts" language from *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), has "earned its retirement" and "is best forgotten" because it is an "incomplete, negative gloss on an accepted pleading standard." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562-63 (2007). In *Twombly*, the Supreme Court stated that "a plaintiff's obligation to provide the 'grounds' of ... 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do." 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citations omitted). Additionally, the Court established a "plausibility standard" in which the pleadings must allege enough to make it clear that relief is not merely conceivable but plausible. *See Twombly*, 550 U.S. at 555-63.

The Court further explained the *Twombly* standard in *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009):

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. ... Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. ...
> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

(Internal citations omitted.)

For the purpose of ruling on the motions to dismiss for failure to state a claim, this court, therefore, will assume that all well-pleaded factual allegations contained in the Complaint are true. Generally, a court may not consider matters outside of the pleadings on a motion to dismiss without converting it to a motion for summary

-13-

judgment. *See* FED. R. CIV. P. 12(d); *Gay v. Wall*, 761 F.2d 175, 178 (4th Cir. 1985).

The court may, however, consider documents that are attached to or referenced in the complaint. *See Moore v. Flagstar Bank*, 6 F. Supp. 2d 496 (E.D.Va. 1997) (citing 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (1990)). As stated above, CNX has filed copies of the five Board pooling orders at issue in this case. (Docket Item No. 30, Atts. 2-6.) Since the Board's orders are referenced in the Complaint, this court will consider these orders as if their terms were contained in the Complaint. Furthermore, at the January 18 hearing, plaintiffs' counsel agreed that these orders may be considered by the court. Thus, the court will determine whether the factual allegations set out in the Complaint, supplemented by these five Board orders, give rise to a plausible claim for relief. Before the court may determine the plausibility of the claims, however, the court must determine what law controls.

On the claims on which the court's jurisdiction is based upon diversity, the court must apply the substantive law of the forum state, including the forum state's choice of law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496-97 (1941); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). This court sits in Virginia. Virginia adheres to the use of traditional rules applicable to conflict of laws. "Under such rules, questions of substantive law are governed by the law of the place of the transaction or the place where the right is acquired (lex loci)." *Frye v. Commonwealth*, 345 S.E.2d 267, 272 (Va. 1986). Under Virginia law, issues regarding real estate are governed by the law of the state where the property is located. *See Mort v. Jones*, 51 S.E. 220 (Va. 1905). Furthermore, under Virginia law, claims for personal injury, whether they be for property damage or conversion, are governed by the law of the

state where the injury occurred. *See Ryder Truck Rental, Inc. v. UTF Carriers, Inc.*, 790 F. Supp. 637 (W.D. Va. 1992). The Complaint alleges that the deemed leases at issue were formed as a result of the actions and orders of the Board, a Virginia state agency, and were to be performed in Virginia. The Complaint also alleges that CNX has been extracting and continues to extract gas from real property located in Virginia. Therefore, under Virginia conflict of law rules, Virginia substantive law would control. *See Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99, 109 (1945) ("the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of litigation, as it would be if tried in a State court"); *Atkins v. Schmutz Mfg. Co.*, 401 F.2d 731, 734 (4th Cir. 1968). Therefore, on all claims, except the federal constitutional claim, Virginia law will control.

The logical starting point in the court's analysis is review of Hale's statutory construction arguments. Hale argues that, under the language of the Gas Act and the Board's orders, he and all similarly situated forced-pooled CBM owners are entitled to judgment against CNX for all, or 8/8ths, of the proceeds from CNX's CBM wells, net CNX's operational costs. Hale bases this claim on two arguments regarding the construction of the language of the Gas Act. First, Hale argues that the language of the Gas Act and the Board's orders provides for all deemed leases to become null and void upon a determination regarding ownership of the CBM rights to a tract. Second, Hale argues that the Gas Act requires CNX, as a "participating operator," to deposit all sums in excess of operating expenses into escrow.

As stated above, the Gas Act gives the Board the authority to create CBM well forced-pooled units and designate the operator of the well. According to the Gas Act:

All pooling orders entered by the Board ... shall:

    ...

4.       Prescribe the conditions under which gas or oil owners may become participating operators...;

    ...

7.       Establish a procedure for a gas or oil owner ... who does not decide to become a participating operator [to] elect either to (I) sell or lease his gas or oil ownership to a participating operator, (ii) enter into a voluntary agreement to share in the operation of the well at a rate of payment mutually agreed to by the gas or oil owner and the gas or oil operator authorized to drill the well, or (iii) share in the operation of the well as a nonparticipating operator on a carried basis after the proceeds allocable to his share equal the following:

        a.      In the case of a leased tract, 300 percent of the share of such costs allocable to his interest; or

        b.      In the case of an unleased tract, 200 percent of the share of such costs allocable to his interest.

VA. CODE ANN. § 45.1-361.21 (2002 Repl. Vol. & 2010 Supp.). The Gas Act defines a "participating operator" as "a gas or oil owner who elects to bear a share of the risks and costs of drilling, completing, equipping, operating, plugging and abandoning a well on a drilling unit and to receive a share of production from the well equal to the proportion which the acreage in the drilling unit he owns or holds under lease bears to the total acreage of the drilling unit." VA. CODE ANN. § 45.1-361.1 (2002 Repl. Vol.).

       With regard to CBM wells, the Gas Act states:

       When there are conflicting claims to the ownership of coalbed

methane gas, the Board, upon application from any claimant, shall enter an order pooling all interests or estates in the coalbed methane gas drilling unit for the development and operation thereof. In addition to the provisions of §45.1-361.21, the following provisions shall apply:

...

2. The Board shall cause to be established an escrow account into which the payment for costs or proceeds attributable to the conflicting interests shall be deposited and held for the interest of the claimants.

3. The coalbed methane gas well operator shall deposit into the escrow account any money paid by a person claiming a contested ownership interest as a participating operator's share of costs pursuant to the provisions of § 45.1-361.21 and the order of the Board.

4. The coalbed methane gas well operator shall deposit into the escrow account one-eighth of all proceeds attributable to the conflicting interests plus all proceeds in excess of ongoing operational expenses as provided for under § 45.1-361.21 and the order of the Board attributable to a participating or nonparticipating operator.

...

6. Any person who does not make an election under the pooling order shall be deemed, subject to a final legal determination of ownership, to have leased his gas or oil interest to the coalbed methane gas well operator as the pooling order may provide.

VA. CODE ANN. § 45.1-361.22 (2002 Repl. Vol. & Supp. 2010).

Thus, under the Gas Act, a gas and oil owner whose CBM interests are forced-pooled has four options: 1) voluntarily sell or lease his interests to a participating operator; 2) voluntarily become a participating operator on terms agreed upon with the operator; 3) become a participating operator under the Gas Act, who shares proportionately in the costs and revenues of the well; or 4) become a nonparticipating

operator who makes no contribution toward the costs of the well, but who also does not recover any proceeds from the well until the proceeds allocable to his interest equal two or three times his share of the costs. If a CBM owner does not elect one of these options, then he is "deemed, subject to a final legal determination of ownership, to have leased his gas or oil interest to the coalbed methane gas well operator as the pooling order may provide." VA. CODE ANN. § 45.1-361.22(6).

It is this language which Hale argues renders any deemed lease void upon a final legal determination of ownership. Neither party has provided the court with any Virginia case law interpreting this or any other portion of the Gas Act. Nor has any party provided the court with any case law interpreting any similar provision adopted by another jurisdiction. The court has found no Virginia case law addressing the Gas Act, nor any case law interpreting a similar provision enacted in another jurisdiction. Thus, the interpretation of this statutory language appears to be a question of first impression.

Hale argues that the location of the phrase, "subject to a final legal determination of ownership," immediately following the word "deemed" means that the lease is being conditionally imposed only until a final legal determination of ownership. *See City of Lynchburg v. English Constr. Co., Inc.*, 675 S.E.2d 197, 201 (Va. 2009) (under the "last antecedent doctrine" of statutory construction, qualifying words refer solely to the last word, phrase or clause). Hale argues that once the lease is nullified, the CBM owner becomes a nonconflicted unleased mineral owner entitled to receive all, or 8/8ths, of the past and future proceeds of the well that are allocable to his interest, net of proper operating costs.

The court need go no further than the language of the Gas Act itself to determine that the General Assembly's overriding purpose in adopting the Gas Act was to promote the commercial production of CBM. The Gas Act, on its face, states:

> The provisions of this chapter shall be liberally construed so as to effectuate the following purposes:
> 1. To foster, encourage and promote the safe and efficient exploration for and development, production, utilization and conservation of the Commonwealth's gas and oil resources;
> 2. To provide a method of gas and oil conservation for maximizing exploration, development, production and utilization of gas and oil resources;
> 3. To recognize and protect the rights of persons owning interests in gas or oil resources contained within a pool;
> 4. To ensure the safe recovery of coal and other minerals;
> 5. To maximize the production and recovery of coal without substantially affecting the right of a gas or oil owner proposing to drill a gas or oil well to explore for and produce gas or oil;
> 6. To protect the citizens and the environment of the Commonwealth from the public safety and environmental risks associated with the development and production of gas or oil; and
> 7. To recognize that use of the surface for gas or oil development shall be only that which is reasonably necessary to obtain the gas or oil.

VA. CODE ANN. § 45.1-361.3 (2002 Repl. Vol.).

While this section of the Gas Act makes mention of protecting the interests of gas and oil owners, the language of the Gas Act clearly places the interests of CBM and coal producers ahead of the interests of CBM owners. For instance, when the Gas

Act was adopted in 1990, the issue of the ownership of CBM was unresolved in Virginia. House Document No. 79, Commonwealth of Virginia, "Report of the Virginia Coal and Energy Commission on the Study of the Regulation of Independent Power Producers and the Oil and Gas Act," 1990, at 7 ("House Doc. No. 79"). Nonetheless, the Gas Act, as written, allows for the forced-pooling of CBM interests for their development and production without the consent of a single CBM owner. In particular, in the case where conflicting claims to the ownership of CBM exists – which is true in every case in Virginia where the coal estate has been severed from the gas estate – the Gas Act requires forced-pooling upon application by "any claimant" – any person who claims an ownership interest – without requiring any proof of ownership. *See* VA. CODE ANN. § 45.1-361.22. Also, the language of the Gas Act specifically exempts CBM well operators from the requirement that they must have written consent of the owners with the right to conduct operations on at least 25 percent of the acreage included in the unit. *See* VA. CODE ANN. § 45.1-361.21(C)(3) (2002 Repl. Vol. & Supp. 2010). Furthermore, the Gas Act recognizes that coal owners may object to the establishment of drilling units or wells and specifically provides for the issues to be considered in deciding such objections. *See* VA. CODE ANN. § 45.1-361.11 (2002 Repl. Vol.). The Gas Act makes no mention of consideration of objections by CBM owners or landowners.

The legislative history of the Gas Act also makes clear the intent to favor production over individual CBM owners' rights. In 1990, a report of the Virginia Coal and Energy Commission stated:

> To date, industry has been unwilling to begin production of this resource in Virginia due to coalbed methane gas ownership issues. The

Commission was told that Virginia Code § 55-154.1 has created a "cloud on title" with regard to the ownership of this gas. Coalbed methane is a migratory gas. [Virginia Code] § 55-154.1, otherwise known as the "Migratory Gas Act," provides that the surface owner, absent other provisions of law to the contrary, is conclusively presumed to be the owner of all migratory gases beneath his surface tract. In addition, the myriad of deeds and leases which have severed mineral estates from the surface estate in Southwest Virginia adds to the problem of determining who owns the coalbed methane gas in question. As a result of this difficulty, industry has been reluctant to drill for and produce this gas for fear of being found civilly liable for a "willful taking" resulting from a bad-faith trespass.

　　To remove the fear of "willful taking" lawsuits, industry representatives suggested repealing the "Migratory Gas Act" and enacting emergency special pooling provisions for coalbed methane gas. The special pooling provisions would allow for the rapid development fo the resource....

House Doc. No. 79 at 7.

This clear legislative intent to promote the development and production of CBM is perhaps most evident in that the language of the Gas Act gives the Board no discretion in whether to grant applications to create a forced-pooled drilling unit. Both § 45.1-361.21, dealing with gas and oil wells in general, and § 45.1-361.22, dealing specifically with CBM wells where there are conflicting ownership claims, state that the Board "upon application ... *shall* enter an order pooling all interests" for development and operation for a well. VA. CODE ANN. §§ 45.1-361.21, 45.1-361.22 (emphasis added).

Hale's construction of the Gas Act would nullify any deemed leases upon final legal determination of CBM ownership and place operators in the very position the Gas Act intended to prevent – that of a trespasser liable for taking resources without

the owner's permission. "While interpreting statutes, courts must ascertain and give effect to the legislature's intention, which is to be deduced from the words used, unless a literal interpretation would result in a manifest absurdity." *Horner v. Dep't of Mental Health, Mental Retardation & Substance Abuse Servs.*, 597 S.E.2d 202, 204 (Va. 2004). Moreover, if the court were to adopt Hale's interpretation of this provision, deemed lessors with conflicted claims of CBM ownership would be put in a much better position once a determination of ownership occurred than CBM owners without conflicted claims who were deemed to have leased their interests. That being the case, I hold that the location of the phrase "subject to a final legal determination of ownership" immediately following the word "deemed" in § 45.1-361.22 was not intended by the General Assembly to conditionally impose the deemed leases only until such time as a final legal determination of ownership. The more proper construction of this phrase, the construction which is in accord with the legislative intent of the Gas Act, is argued by CNX – that the phrase simply recognizes that any party's interest under a deemed lease is subject to a final legal determination of ownership. Thus, I find that Hale's claim that the language of the Gas Act nullifies the deemed leases upon a determination of ownership cannot be legally sustained, and I will recommend that the court grant the Motions and dismiss Count I of the Complaint insofar as it seeks a judgment for 8/8ths of the net proceeds from these CBM wells.

The court's rejection of Hale's statutory construction argument regarding the deemed lease provision of the Gas Act negates his claim for 8/8ths of the net proceeds of these CBM wells. Nonetheless, based on Hale's claim for an accounting by CNX, it is still necessary for the court to address Hale's argument that the Gas Act and the

Board's orders require CNX to escrow all proceeds from their CBM wells. In particular, Hale argues that CNX qualifies as a "participating operator" as defined by the Gas Act in § 45.1-361.1. Furthermore, Hale argues that, under § 45.1-361.22(4), CNX must deposit into escrow all proceeds in excess of ongoing operational expenses attributable to a participating operator. Thus, Hale argues, since CNX qualifies as a participating operator, all proceeds, net ongoing operational expenses, due to CNX also must be placed in escrow. CNX concedes that § 45.1-361.22(4) requires CNX, as a CBM gas well operator, to deposit into escrow all proceeds attributable to any conflicted participating operator's interest. CNX disputes, however, that, as a CBM gas well operator, it also qualifies as a "participating operator" under the Gas Act or that it is required to deposit any of the proceeds attributable to its interest into escrow.

The Gas Act defines a "participating operator" as a "gas or oil owner who elects to bear a share of the risks and costs of drilling, completing, equipping, operating, plugging and abandoning a well on a drilling unit and to receive a share of production from the well equal to the proportion which the acreage in the drilling unit he owns or holds under lease bears to the total acreage of the drilling unit." VA. CODE ANN. § 45.1-361.1. The Gas Act defines "gas or oil owner" as "any person who owns, leases, has an interest in, or who has the right to explore for, drill or operate a gas or oil well as principal or as lessee." VA. CODE ANN. § 45.1-361.1.

The Gas Act also states that all pooling orders entered by the Board shall "[p]rescribe the conditions under which gas or oil owners may become participating operators." *See* VA. CODE ANN. § 45.1-361.21(C)(4). Each of the five pooling orders which pertain to Hale's land state:

> Any Gas owner or Claimant ... who does not reach a voluntary agreement with the Unit Operator may elect to participate in the well development and operation in the Subject Drilling Unit (hereafter "Participating Operator") by agreeing to pay the estimate of such Participating Operator's proportionate part of the actual and reasonable costs of ... development ... including a reasonable supervision fee.... [A] Participating Operator agrees to pay the estimate of such Participating Operator's proportionate part of the Completed-for-Production Cost....

The Gas Act also defines "coalbed methane gas well operator" as "any person who has been designated to operate or who does operate a coalbed methane gas well." VA. CODE ANN. § 45.1-361.1.

It is true, under the plain language of the Gas Act, that CNX qualifies as a gas or oil owner. The Board's orders show that CNX either owns or has obtained voluntary leases with some unconflicted owners of CBM rights in these pooling units which give it the right to explore for CBM and drill and operate CBM wells. The plain language of the Gas Act does not show, however, that the General Assembly intended that all CBM gas well operators who had obtained CBM rights should be considered "participating operators." Instead, the Gas Act states that it is leaving to the Board the discretion to determine how an owner may qualify as a "participating operator." Again, under the Board's orders before the court, an owner must elect to become a "participating operator." Furthermore, under the Board's orders, only owners who do not reach a voluntary agreement with the CBM well operator may elect to become a "participating operator." It is nonsensical to say that CNX, the designated CBM gas well operator, has not reached a voluntary agreement with itself. Therefore, I recommend that the court reject this argument.

Hale further argues that, if the court rejects his arguments regarding the construction of the language of the Gas Act, then the Gas Act is unconstitutional because it allows for the taking of private property for private use or, in the alternative, it allows for the taking of private property for public use without just compensation. *See* U.S. CONST. amend. V, XIV, VA. CONST. art. I, § 11. The defendants argue that similar state statutory schemes setting up forced-pooling for the development of gas and oil resources have been universally upheld by the courts for decades, including the United States Supreme Court. While the constitutionality of similar statutes has been considered by both federal and state courts, it does not appear that the constitutionality of the Virginia Gas Act has been considered by any court.

I believe a brief history of the development of oil and gas law is necessary before considering the constitutional issues. Traditionally, oil and gas have been treated differently than other minerals under the law. The United States Supreme Court recognized this difference in *Brown v. Spilman*, 155 U.S. 665 (1895).

> Petroleum gas and oil are substances of a peculiar character, and decisions in ordinary cases of mining, for coal and other minerals which have a fixed situs, cannot be applied to contracts concerning them without some qualifications. They belong to the owner of the land, and are part of it, so long as they are on it or in it or subject to his control; but when they escape and go into other land, or come under another's control, the title of the former owner is gone. If an adjoining owner drills his own land, and taps a deposit of oil or gas, extending under his neighbor's field, so that it comes into his well, it becomes his property.

*Brown*, 155 U.S. at 669-70 (citations omitted). This is known as the "rule of capture." The Supreme Court of Pennsylvania in *Westmoreland & Cambria Natural Gas Co.*

*v. DeWitt*, 18 A. 724 (Pa. 1889), explained the difference by comparing oil and gas to wild animals or game.

> Water and oil, and still more strongly gas, may be classed by themselves, if the analogy be not too fanciful, as minerals *feroe naturoe*. In common with animals, and unlike other minerals, they have the power and the tendency to escape without the volition of the owner. Their "fugitive and wandering existence within the limits of a particular tract was uncertain," .... They belong to the owner of the land, and are a part of it, so long as they are on or in it, and are subject to his control; but when they escape, and go into other land, or come under another's control, the title of the former owner is gone. Possession of the land, therefore, is not necessarily possession of the gas.

*Westmoreland & Cambria Natural Gas Co.*, 18 A. at 725 (internal citations omitted).

The Supreme Court, while recognizing a similarity between wild animals and moving minerals such as oil and gas, has held that oil and gas deposits are not "public" things. *See Ohio Oil Co. v. Indiana*, 177 U.S. 190, 208-09 (1900).

> ...[T]hings which are *feroe naturoe* belong to the "negative community;" in other words, are public things subject to the absolute control of the state, which, although it allows them to be reduced to possession, may at its will not only regulate, but wholly forbid, their future taking.

*Ohio Oil Co.*, 177 U.S. at 208-209. In the case of oil and gas, however, the Supreme Court noted that only the owners in fee of the surface above the deposits have the right to reduce these resources to possession. *See Ohio Oil Co.*, 177 U.S. at 209.

This distinction in who has the right to take possession of oil and gas also

results in a distinction regarding a state's ability to regulate.

> In the one, as the public are the owners, every one may be absolutely prevented from seeking to reduce to possession. No devesting of private property under such a condition can be conceived, because the public are the owners, and the enacting by the state of a law as to the public ownership is but the discharge of the governmental trust resting in the state as to property of that character. ... On the other hand, as to gas and oil the surface proprietors within the gas field all have the right to reduce to possession the gas and oil beneath. They could not be absolutely deprived of this right which belongs to them without a taking of private property. But there is a coequal right in them all to take from a common source of supply the two substances which in the nature of things are united, though separate. It follows from the essence of their right and from the situation of the things as to which it can be exerted, that the use by one of his power to seek to convert a part of the common fund to actual possession may result in an undue proportion being at-tributed to one of the possessors of the right to the detriment of the others, or by waste by one or more to the annihilation of the rights of the remainder. Hence it is that the legislative power, from the peculiar nature of the right and the objects upon which it is to be exerted, can be manifested for the purpose of protecting all the collective owners, by securing a just distribution, to arise from the enjoyment, by them, of their privilege to reduce to possession, and to reach the like end by preventing waste.

*Ohio Oil Co.*, 177 U.S. at 209-10.

Based on this reasoning, the Supreme Court upheld an Indiana statute that made it unlawful to allow the open flow into the air of gas or oil from a well for more than two days. *See Ohio Oil Co.*, 177 U.S. at 212. The oil company plaintiff had argued that the statute amounted to an unlawful taking of private property without just compensation in violation of the due process clause of the Fourteenth Amendment to the United States Constitution. The Court disagreed: "[T]he law ... which is here

attacked because it is asserted that it is devested private property without due compensation, in substance, is a statute protecting private property and preventing it from being taken by one of the common owners without regard to the enjoyment of the others." *Ohio Oil Co.*, 177 U.S. at 210.

In *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61 (1911), the Supreme Court upheld a New York statute that prohibited the pumping of mineral waters for the purpose of collecting carbonic acid gas from the water. Natural Carbonic Gas Co. owned property in New York on which it drilled wells and pumped mineral waters from an underground reservoir for the purpose of collecting and selling the gas as a separate commodity. Much of the leftover mineral water went to waste. The gas company argued that the law violated the Fourteenth Amendment in that the law deprived it of property without due process of law and denied it equal protection under the law. *See Lindsley*, 220 U.S. at 63. Based, in large part, on its reasoning in *Ohio Oil Co.*, the Court said the law did not "take from any surface owner the right to tap the underlying rock and to draw from the common supply, but, consistently with the continued existence of that right, so regulates its exercise as reasonably to conserve the interests of all who possess it." *Lindsley*, 220 U.S. at 77.

In *Walls v. Midland Carbon Co.,* 254 U.S. 300 (1920), the Court denied a Fourteenth Amendment challenge to a Wyoming statute which prohibited, within 10 miles of any incorporated town or industrial plant, the burning of natural gas to produce carbon black, a substance used to make printer's ink, or the burning of natural gas without the heat being fully and actually applied and utilized for either manufacturing or domestic purposes. Prior to the law's enactment, the plaintiff in the

case, Midland Carbon Co., had erected a plant for the production of carbon black from the burning of natural gas less than two miles from an incorporated town. Midland sued in an attempt to prevent enforcement of the law.

The Court noted that the declared purpose of that act was "the conservation of natural gas." *Walls*, 254 U.S. at 309. The Court stated that the question before it was whether the legislation was a valid exercise of the police power of a state or an arbitrary interference with private property rights. *See Walls,* 254 U.S. at 313-14. The Court relied on a 1907 sheep herding case in recognition of the proposition that "a state may consider the relation of rights and accommodate their coexistence, and, in the interest of the community, limit one that others may be enjoyed." *Walls,* 254 U.S. at 315 (citing *Bacon v. Walker*, 204 U.S. 314 (1907)). "...[W]here equal rights existed the state has an interest in their accommodation." *Walls,* 254 U.S. at 315. The Court stated, "The determining consideration is the power of the state over, and its regulation of, a property in which others besides the companies may have rights, and in which the state has an interest to adjust and preserve; natural gas being one of the resources of the state." *Walls,* 254 U.S. at 319.

The Court recognized the similarities between the natural gas case before it and the *Lindsley* case, where the state of New York prohibited the wasteful use of mineral waters. *See Walls,* 254 U.S. at 318-19 (citing *Lindsley*, 220 U.S. 61). In *Lindsley,* the Court allowed the state to prohibit the waste of mineral waters "to preserve from depletion the subterranean supply common to [the surface owner] and other owners..." *Walls,* 254 U.S. at 323. The Court noted that, in the case before it, Wyoming was asserting that the law was enacted "to prohibit an extravagant, or wasteful, or

disproportionate use of the natural gas of the state." *Walls,* 254 U.S. at 323. As such, the Court agreed that it was not an unconstitutional exercise of power.

In *Bandini Petroleum Co. v. Superior Court*, 284 U.S. 8 (1931), the Court considered a constitutional challenge to a California law that allowed the state, acting through its director of natural resources, to go to Superior Court to enjoin waste of the state's natural gas resources by oil and gas producers. The oil company argued that the statute violated the due process clause of the Fourteenth Amendment in that it provided no "certain or definite standard as to what constituted 'waste' or 'unreasonable waste,' and unlawfully delegated power to the Superior Court to legislate upon that subject." *Bandini*, 284 U.S. at 13. The oil company further asserted that requiring it to curtail its gas and oil production "'for the purpose of conserving such natural gas for the benefit of the general public'" without just compensation was outside of the state's powers. *Bandini*, 284 U.S. at 13. The Court upheld the law stating: "If the statute be viewed as one regulating the exercise of the correlative rights of surface owners with respect to a common source of supply of oil and gas, the conclusion that the statute is valid upon its face, that is, considered apart from any attempted application of it ... is fully supported by the decisions of this Court." *Bandini*, 284 U.S. at 22.

In *Champlin Refining Co. v. Corp. Comm'n*, 286 U.S. 210 (1932), the Supreme Court upheld an Oklahoma law that allowed the state corporation commission to issue orders prorating the amount of oil and gas each owner could take from a common source. The oil company argued that the law violated the due process and equal protection clauses of the Fourteenth Amendment. The Court stated:

In Oklahoma, as generally elsewhere, landowners do not have absolute title to the gas and oil that may permeate below the surface. These minerals, differing from solids in place such as coal and iron, are fugacious and of uncertain movement within the limits of the pool. Every person has the right to drill wells on his own land and take from the pools below all the gas and oil that he may be able to reduce to possession including that coming from land belonging to others, but the right to take and thus to acquire ownership is subject to the reasonable exertion of the power of the state to prevent unnecessary loss, destruction, or waste. And that power extends to ... the unreasonable and wasteful depletion of a common supply of gas and oil to the injury of others entitled to resort to and take from the same pool.

*Champlin Refining Co.*, 286 U.S. at 233-34.

The Court did find unconstitutional, however, Texas state action that limited production from pipeline-owning gas well owners in an effort to force those owners to buy gas from well owners who did not have access to pipelines. *See Thompson v. Consol. Gas Utils. Corp.*, 300 U.S. 55 (1937). In striking the regulatory scheme at issue, the Court stated that it had "many times warned that one person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid." *Thompson*, 300 U.S. at 80. In *Thompson*, a Texas statute allowed the Texas Railroad Commission to reduce the amount of gas produced from wells served by pipelines to below their market requirements under then-existing contracts. *See* 300 U.S. at 66. This action forced the pipeline owners to purchase gas from wells not served by the pipelines to meet its contractual obligations. *See Thompson*, 300 U.S. at 66-67. The Court stated:

... Under [the] statute, if obeyed, the State takes from the pipe line owner the money with which the purchase is made, the money lost

> through curtailed use of properties developed at large expense, the money lost because of the drainage away from his land of the gas which he is forbidden to produce for himself, but must buy from those towards whose lands it migrates.
>
> Our law reports present no more glaring instance of the taking of one man's property and giving it to another.

*Thompson*, 300 U.S. at 79. In reaching its conclusion, the Court noted that the lower court had found that the orders at issue were not intended to prevent waste or to adjust correlative rights in a common reservoir. *See Thompson*, 300 U.S. at 72-73.

In *Hunter Co., Inc., v. McHugh*, 320 U.S. 222 (1943), the Court found that a Louisiana act that provided for the establishment of oil drilling units and equitable apportionment of proceeds among owners was not unconstitutional on its face. "We have held that a state has constitutional power to regulate production of oil and gas so as to prevent waste and to secure equitable apportionment among landholders of the migratory gas and oil underlying their land, fairly distributing among them the costs of production and of the apportionment." *Hunter Co., Inc.*, 320 U.S. at 227.

Also, a number of state high courts have upheld statutory or regulatory schemes that prevent waste and secure equitable apportionment among landowners of oil and gas rights. In 1938, the Supreme Court of Oklahoma upheld a statutory scheme known as the "well-spacing act." *See Patterson v. Stanolind Oil & Gas Co.*, 77 P.2d 83 (Okla. 1938) (appeal dismissed by *Patterson v. Stanolind Oil & Gas Co.*, 305 U.S. 376 (1939)). The act gave the Corporation Commission authority to promulgate rules and regulations as to the spacing of oil and gas wells in common pools. At issue in *Patterson* was a Corporation Commission order that established an 80-acre drilling unit made up of two tracts of land held by different mineral owners. *See* 77 P.2d at 85-

86. The mineral owner of the tract on which the well was drilled argued that the order, which was entered some months after the completion of the well, violated his constitutional due process, equal protection and contract rights. *See Patterson*, 77 P.2d at 86. Specifically, this mineral owner attacked the portions of the order which apportioned the royalties received among all mineral owners in the drilling unit. *See* 77 P.2d at 86.

> The plaintiff contends that according to the fundamental rule of oil and gas ownership, the owner of land is entitled to all of such minerals that he is able to reduce to possession thereon and that he ... according to said rule is entitled to the portion of all of the oil and gas produced on ...[his] 6¼ acres.... His contention is that when such portion is reduced by the distribution of this production among the owners of the adjoining 3¾ acres, he is deprived of property without due process of law and that the same is taken for private use without just compensation and that the contractual obligations of both the deed and the lease are thereby abrogated.

*Patterson*, 77 P.2d at 87.

The Oklahoma court rejected these arguments, noting:

> ...[T]he right of the owner of land to the oil and gas thereunder is not exclusive but is common to and merely coequal with the rights of other landowners to take from the common source of supply, and therefore that his property rights to said oil and gas are subject to the legislative power to prevent the destruction of the common source of supply.

*Patterson*, 77 P.2d at 87. The court held that it was a valid exercise of the state's police power to restrict the individual owner's taking from a common source of supply or to equitably apportion among all landowners any of the common supply taken by

an individual landowner.  *See Patterson*, 77 P.2d at 88, 89.

> Thus, in our opinion, the lawful exercise of the state's power to protect the correlative rights of owners in a common source of supply of oil and gas is not a proper subject for the invocation of the provisions of either the State or Federal Constitution which prohibit the taking of property without just compensation or without the due process of law and forbid the impairment of contract obligations. As we view it, the property here involved has not been taken or confiscated: its use has merely been restricted and qualified. This does not violate the due process clause of either Constitution.

*Patterson*, 77 P.2d at 89.

In 1950, the Supreme Court of California upheld a law that prohibited the development of an oil well on a tract of land of less than one acre. *See Hunter v. Justice's Court of Centinela Twp.,* 223 P.2d 465 (Cal. 1950).  Hunter, the owner of two lots consisting of less than an acre in area located in a townsite in a residential area, was charged with violating the statute by drilling for oil despite being denied a permit to do so by the state oil supervisor.  *See Hunter*, 223 P.2d at 466.  The two lots at issue were surrounded by property leased by Shell Oil Company.  Shell had applied for and received a permit to drill for and produce oil from this land.  Under the permit, the supervisor had declared that Hunter's two lots were "deemed" included in the company's lease. *See Hunter*, 223 P.2d at 466. The law at issue provided that the "deemed lessors" would receive a share of the landowners' royalty equal to the proportion their land held to the entire area included in the leased property, with the minimum landowner's royalty being the value of 1/8th of the oil and gas produced. *See Hunter*, 223 P.2d at 467.

In upholding the law at issue against an allegation that it violated the deemed lessor's due process and equal protection rights, the court stated:

> It is the settled rule that "a state has constitutional power to regulate production of oil and gas so as to prevent waste and to secure equitable apportionment among landholders of the migratory gas and oil underlying their land, fairly distributing among them the costs of production and of the apportionment. ... In conformity with that principle it has been recognized that certain measures are proper, such as the regulation of the space between wells or limitation of area to each. ...

*Hunter*, 223 P.2d at 467-68 (internal citations omitted). The court recognized that it could not declare the law invalid unless it found that it was an "arbitrary and unreasonable method of achieving conservation of oil and equal protection of the several owners' right to extract it." *Hunter*, 223 P.2d at 468.

The court recognized that the Eighth Circuit previously had upheld similar legislation prohibiting the drilling of more than one well per city block in *Marrs v. City of Oxford*, 32 F.2d 134 (8th Cir. 1929). In *Marrs*, the Eighth Circuit recognized that, under Kansas law, there was "no property in oil and gas, because of their migratory nature, until they have been captured, though each surface owner may take without limit, unless lawfully restrained." *Marrs,* 32 F.2d at 140. Unless restrained, the court noted, that this would result in adjoining landowners drilling wells as quickly as possible in order to reach the pool and take as much as possible before others could do so. *See Marrs*, 32 F.2d at 140. Although the city ordinance at issue in *Marrs* allowed the drilling of only one well per block, it required the permitee of that well to pay all unleased landowners in that block their proportionate share of a 1/8th royalty. *See Marrs*, 32 F.2d at 135. The Eighth Circuit held that the ordinances at issue

made "every effort to protect, rather than to destroy rights. They extend equal opportunity to all who have an interest and eliminate the race between those having equal rights in a common source of wealth, so that some may not take all and leave others with nothing." *Marrs*, 32 F.2d at 140. It is important to note that the ordinance did require that the drilling permit be issued to the lessee who held leases for the largest amount of acreage in the block. *See Marrs v. City of Oxford*, 24 F.2d 541, 552 (D. Kan. 1928).

There is, however, one glaring difference between the Virginia Gas Act with regard to its application to CBM wells and the gas and oil acts of other states which have been upheld in the face of constitutional challenges. The Virginia Gas Act with regard to CBM does not merely apportion rights among mineral owners. Instead, as noted above, it allows for the forced-pooling of CBM interests for their development and production without the request or consent of a single CBM owner. The Gas Act requires forced-pooling of CBM rights upon application by "any claimaint" in any case where conflicting claims to the ownership of CBM exists. *See* VA. CODE ANN. § 45.1-361.22. Therefore, the person seeking the establishment and forced-pooling of a CBM drilling unit does not have to prove any ownership interest in the affected CBM estate. Thus, under the language of the Gas Act, as written, a gas company, who may have no true CBM ownership rights whatsoever, may apply to establish a forced-pooled CBM drilling unit among unconsenting owners, be designated as CBM well operator, and receive up to 7/8ths of the net proceeds of the well – while the true owners of the CBM receive only a 1/8th royalty.

Hale argues that this scenario would amount to the taking of private property for private use. The United States Supreme Court has held that "[t]he taking by a state

of the private property of one person or corporation, without the owner's consent, for the private use of another, is not due process of law, and is a violation of the fourteenth ... amendment of the constitution of the United States." *Mo. Pac. Ry. Co. v. Nebraska*, 164 U.S. 403, 417 (1896). This principle has been universally recognized since the origin of this nation. In 1798, Justice Samuel Chase wrote:

> An ACT of the Legislature (for I cannot call it a law) contrary to the great first principles of the social compact, cannot be considered a rightful exercise of legislative authority. ... A few instances will suffice to explain what I mean.... [A] law that takes property from A, and gives it to B: It is against all reason and justice, for a people to entrust a Legislature with SUCH powers; and, therefore, it cannot be presumed that they have done it.

*Calder v. Bull*, 3 U.S. 386, 388 (1798) (emphasis in original).

No one in this case asserts that the state action involved amounts to a taking for public use.[1] Instead, CNX and the Commonwealth assert that no "taking" has occurred. CNX and the Commonwealth argue that the Gas Act is simply a valid regulation of the use of the state's natural resources under its police powers. The cases cited as support for this proposition, are based almost unanimously upon a finding that

---

[1] The concept of what amounts to a "public use" has become increasingly expansive over the years. For instance, the Supreme Court has held that the taking of privately held land in Hawaii in order to transfer it to other private individuals is a taking for public use. *See Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229 (1984). The Supreme Court also has held that the taking of real property for the purpose of transferring it to another private entity for economic development purposes is a taking for a public use. *See Kelo v. City of New London*, 545 U.S. 469 (2005). As Justice Stevens noted in *Kelo*, "when this Court began applying the Fifth Amendment to the States at the close of the 19th century, it embraced the broader and more natural interpretation of public use as "public purpose." 545 U.S. at 480.

the laws at issue do not take, but rather give, landowners interests in the oil and gas underneath their land not recognized at common law. In particular, the United States Supreme Court in *Ohio Oil Co.*, 177 U.S. at 208, based its decision on Indiana law that gave surface owners no title to the oil and gas beneath their lands before it was brought to the surface and reduced to possession. The Court noted that a surface owner has the exclusive right on his own land to seek to acquire them, but they do not become his property until the effort has resulted in dominion and control by actual possession. *See Ohio Oil Co.*, 177 U.S. at 208-09.

I can find no Virginia appellate cases specifically addressing the rights of adjoining oil and gas owners. The Virginia Supreme Court, however, has addressed the issue of adjoining landowners' rights to subterranean sources of water. In *Couch v. Clinchfield Coal Corp.*, 139 S.E. 314, 315 (Va. 1927), the Virginia court noted, "[t]he courts are practically unanimous in holding that a landowner, under whose land there is oil, gas, or water, cannot complain of a neighbor who in pumping on his own property drains the oil, gas, or water from his lands." The court recognized that other courts had drawn an analogy between subterranean oil and subterranean or percolating water. *See Couch*, 139 S.E. at 315. The court noted that "no correlative rights exist between proprietors of adjacent lands with respect to percolating waters found therein." *Couch,* 139 S.E. at 315. Therefore, the court held that a landowner may lawfully dig a well on his own land or conduct mining operations thereon even though he may destroy a neighbor's spring or well without incurring any liability. *See Couch*, 139 S.E. at 315-16.

The Virginia Supreme Court recently has upheld a circuit court opinion specifically holding that, absent an express grant of CBM, natural gases or minerals

in general, the surface landowner retains the rights to CBM. *See Harrison-Wyatt*, *LLC v. Ratliff*, 593 S.E.2d 234 (Va. 2004) (affirming *Ratliff v. Harrison-Wyatt, LLC,* Chancery No. 187-00, slip op. at 8 (Buchanan County Circuit Court, December 6, 2002)). The issue before the court was simply whether a grant of the coal estate also granted rights in the CBM found in that coal. The circuit court held "that a grant of coal rights does not include title to the CBM absent an express grant of CBM, natural gases, or minerals in general; and that the surface owner holds the rights to the CBM once it has separated from the coal." *Ratliff,* Chancery No. 187-00, slip op. at 8. Other than this last phrase, there is no indication in the circuit court's opinion of any intention to deviate from the common law rule of capture with regard to oil and gas. Furthermore, an examination of the opinion as a whole shows that, in inserting this phrase, the court was reiterating its ruling that, while the surface owner retained the rights to the CBM, the surface owner had no right to infringe upon the coal estate to fracture the coal to force it to release the CBM. It is important to note that this same circuit court only five years earlier held that Virginia followed the common law rule of capture prior to adoption of the Gas Act in 1990. *See Mac Constr., Inc. v. Yukon Pocahontas Coal Co.,* Chancery No. 247-96, slip op. at 2-4 (Buchanan County Circuit Court, Sept. 29, 1999). The circuit court recognized that, under the common law, "oil and gas were said to have no ownership until captured...." *Mac Constr., Inc.,* slip op. at 3.

Thus, the Gas Act, like other similar acts upheld against constitutional "takings" challenges, does not take property from landowners, but rather gives the landowners a right to receive a share of the value of the CBM taken from under their property – a right that did not exist at common law. Hale's counsel argue that they do not contest the Commonwealth's ability to establish correlative rights through forced-pooling.

Instead, they argue that, once the Gas Act established correlative rights, a gas owner has a property right to his proportional share of the gas contained in the unit. That share, they argue, is a proportional share of the full value, or 8/8ths, of the gas produced, net operating expenses. They further argue that the deemed lease provision of the Gas Act, which requires a transfer of this right for only a 1/8th royalty, in essence, takes the gas owner's right to the other 7/8ths of the value of the gas and gives it to the producer, resulting in an unconstitutional taking for private purposes. Hale's counsel argue that other similar statutory schemes have avoided this unlawful taking by making the default provision for those who fail to make an election that of a nonparticipating or carried operator, who receives a proportional share of all a well's net proceeds after payment of his share of the expenses to bring the well to production.

The logic of Hale's argument is flawed in at least one very important aspect, however. The Gas Act does not create a correlative right in a gas owner to a proportional share of 8/8ths of the gas or its equivalent value in a forced-pooled unit. The Gas Act defines "correlative rights" as "the right of each gas or oil owner having an interest in a single pool to have a fair and reasonable *opportunity* to obtain and produce his just and equitable share of production of the gas or oil – in such pool or its equivalent." VA. CODE ANN. § 45.1-361.1 (emphasis added). The Gas Act provides that *opportunity* by requiring that the gas owner have the right to elect to receive his full proportional share of the net proceeds from a well by choosing to either become a participating or nonparticipating operator. Only if the gas owner fails to make an election, as Hale did, is his interest deemed leased for a 1/8th royalty.

I further note that, while the Gas Act, as written, might allow the Board to

force-pool the interests of CBM owners on the application of a producer who has no actual ownership interest in the CBM, that is not the case currently before the court. Whether the CBM at issue here is found to belong to the coal owners or to those retaining all other mineral rights, CNX has a property interest in the CBM taken from these wells either through ownership of the land in fee or through voluntary leases with the coal and gas estate owners. Therefore, as applied in this instance, the Gas Act is "regulating the exercise of the correlative rights of surface owners with respect to a common source of supply of oil and gas." *Bandini*, 284 U.S. at 22.

The Supreme Court has held that "one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that ... it might also be taken as applying to other persons or other situations in which its application might be unconstitutional." *United States v. Raines*, 362 U.S. 17, 21 (1960). The Supreme Court has recognized that:

> In addition to the limitations on standing imposed by Art. III's case-or-controversy requirement, there are prudential considerations that limit the challenges courts are willing to hear. "[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 ... (1975) .... The reason for this rule is twofold. The limitation "frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy," United *States v. Raines*, 362 U.S. at 22, ... and it assures the court that the issues before it will be concrete and sharply presented.

*Sec'y of State of Md. v. Joseph H. Munson Co., Inc.,* 467 U.S. 947, 955 (1984).

For all these reasons, I recommend that the court reject Hales's constitutional challenge to the statute, grant the Motions and dismiss those portions of Count I of the Complaint which seek a declaratory judgment finding the Gas Act unconstitutional.

The Complaint also purports to raise a number of common law tort claims against CNX, including claims for trespass, conversion, negligence, breach of fiduciary duties and unjust enrichment. CNX claims that each of these claims is barred because Hale failed to exhaust his administrative remedies under the Gas Act. CNX also argues that the Amended Complaint fails to state sufficient facts to adequately plead these causes of action. CNX further argues that each of these claims is barred by application of either the applicable statute of limitation or the equitable doctrine of laches. For the reasons stated below, I reject CNX's argument that these claims are barred by a failure to exhaust administrative remedies or by the applicable statute of limitations or doctrine of laches. I also recommend that the court deny the Motion insofar as it asserts that the remaining counts of the Complaint, other than Count IV, fail to state claims upon which relief may be granted.

Although I have recommended that the court reject Hale's claim for 8/8ths of the net proceeds of these wells, Hale also alleges in the Complaint that CNX has not properly calculated and placed in escrow a 1/8th royalty. CNX argues that Hale's only recourse in such a case is to return to the Board and request the Board to force CNX to comply with its orders. From my review of the Gas Act, I can find no provision that requires Hale to exhaust an administrative remedy before the Board before pursuing his tort claims. In fact, from my review of the Gas Act, I can find no specific authority to allow the Board to entertain claims raised by royalty owners against

producers. The Gas Act does give the Board "the power necessary to execute and carry out all of its duties." VA. CODE ANN. § 45.1-361.14(B) (2002 Repl. Vol.). Further, one of the responsibilities of the Board is to protect correlative rights. *See* VA. CODE ANN. § 45.1-361.15(B)(2) (2002 Repl. Vol.). The regulations adopted pursuant to the Gas Act do make mention of petitions other than those seeking forced-pooling orders. *See* 4 VA. ADMIN. CODE § 25-160-140 (2010). Also, under the Gas Act, the Board may maintain a suit to restrain any violation or threatened violation of the Gas Act. *See* VA. CODE ANN. § 45.1-361.24 (2002 Repl. Vol.). The Gas Act, however, makes no specific mention of any Board authority to entertain claims between royalty owners and producers based on the producers' failure to properly account for or pay royalties.

In *Va. Imports, Inc. v. Kirin Brewery of Am., LLC*, 296 F. Supp. 2d 691, 697 (E.D. Va. 2003), the Eastern District of Virginia rejected a similar argument that a Virginia regulatory scheme that regulates the business relationships between beer manufactures and local beer wholesalers, the Virginia Beer Franchise Act, VA. CODE ANN. §§ 4.1-500 et seq., preempted any action at common law for fraud raised by a distributor against a manufacturer. The court held:

> Under Virginia law, the common law of England continues in full force and is the rule of decision, except as altered by the General Assembly. *Williams v. Matthews*, ... 448 S.E.2d 625, 629 (1994). The common law will not be considered as altered or changed by statute unless legislative intent is plainly manifested. *Id.*; *Boyd v. Commonwealth*, ... 374 S.E.2d 301, 302 (1988); *Hyman v. Glover*, ... 348 S.E.2d 269, 271 (1986). A statutory change in the common law is limited to that which is expressly stated or necessarily implied because the presumption is that no other or additional change was intended. *Boyd*, 374 S.E.2d at 302. Therefore, "[w]hen an enactment does not encompass

the entire subject covered by the common law, it abrogates the common-law rule only to the extent that its terms are directly and irreconcilably opposed to the rule." *Mitchem v. Counts*,... 523 S.E.2d 246, 250 (2000). Statutes in derogation of the common law are to be strictly construed and not to be enlarged in their operation by construction beyond their express terms. *Jan Paul Fruiterman, M.D. & Assocs., P.C. v. Waziri*, ... 525 S.E.2d 552, 554 (2000).

*Va. Imports, Inc.,* 296 F. Supp. 2d at 697.

Likewise, in this case, I can find no mention in the Gas Act that it is intended to preempt common law tort claims a royalty owner may have against a producer. Furthermore, the Gas Act contains no language stating that it provides the sole remedies or exclusive venue available to a forced-pooled CBM owner. Even the section of the Gas Act cited by CNX as barring Hale's claims, VA. CODE ANN. § 45.1-361.9 (2002 Repl. Vol.), does not state that Hale's only recourse is to seek appeal of the Board's orders to the appropriate circuit court. Instead, it states: "Any order or decision of the Board *may* be appealed to the appropriate circuit court." VA. CODE ANN. § 45.1-361.9(A) (emphasis added). Therefore, I hold that the Gas Act does not preempt a CBM royalty owner's common law tort claims against a producer. I next will address whether the Complaint states facts sufficient to state each such cause of action.

Count II of the Complaint purports to state a claim for trespass. The Virginia Supreme Court has recognized actions for trespass and trespass on the case for the wrongful cutting of timber. *See Wood v. Weaver*, 92 S.E. 1001, 1003 (Va. 1917). In 1922, the Virginia Supreme Court recognized the right of a landowner to file similar actions for the wrongful taking of manganese. *See French v. Stange Mining Co.,* 114 S.E. 121 (Va. 1922). In general, trespass is an "unauthorized invasion of one's interest

in personal property or an entry on another's ground without lawful authority." 18 MICHIE'S JURISPRUDENCE, Trespass § 2 (2005). While the Complaint does not allege an unlawful invasion of Hale's land, it does allege an unlawful taking of Hale's CBM interests. While I have recommended that the court reject Hale's claim that the owners of forced-pooled CBM rights are entitled to all of the net proceeds from these CBM wells, under the Gas Act and the Board's orders, such owners would be entitled to their proportional share of a 1/8th royalty interest from CNX. As stated above, the Complaint also alleges that CNX has not fully accounted for the full production of these wells and has not deposited sufficient sums into escrow to adequately compensate the CBM owners for a 1/8th royalty interest. That being the case, I find that the Complaint pleads sufficient facts to state a cause of action for trespass, and I recommend that the court deny the Motions as to Count II of the Complaint.

Count III of the Complaint purports to state a claim for conversion. Virginia law defines conversion as any distinct act of dominion or control wrongfully exerted over the property of another, either inconsistent with, or in denial of, the owner's rights. *See Simmons v. Miller,* 544 S.E.2d 666, 679 (Va. 2001); *Hairston Motor Co. v. Newsome*, 480 S.E.2d 741, 744 (Va. 1997). Again, the Complaint alleges that CNX has not fully accounted for the full production of the CBM wells at issue and has not deposited sufficient sums into escrow to adequately compensate the CBM owners for a 1/8th royalty interest. I find that these facts are sufficient to allege a cause of action for conversion, and I recommend that the court deny the Motions as to Count III of the Complaint. *See PGI, Inc. v. Rathe Prods., Inc.*, 576 S.E.2d 438, 443 (Va. 2003) (any wrongful exercise over another's goods, including sums of money, in denial of the lawful owner's rights, states a claim for conversion).

Counts IV and V of the Complaint purport to state causes of action based on CNX's negligence. Count IV asserts that CNX was negligent in its efforts to properly identify the true owners of the CBM being produced from these wells and in failing to make any effort to petition the Board to pay royalties out of escrow after the Virginia Supreme Court's ruling in *Harrison-Wyatt, LLC*. CNX argues, and I agree, that Hale has no standing to assert a claim that CNX was negligent in continuing to claim conflicting ownership claims before the Board after the court's ruling in *Harrison-Wyatt, LLC*. The relevant pooling orders in this case were entered in 1999, 2000 and 2001, prior to the court's ruling in *Harrison-Wyatt, LLC*, in 2004. The Complaint also alleges, however, that CNX negligently continued to pay royalties into escrow based on continuing "conflicting claims" after the court's decision and negligently failed to amend its previously submitted schedules of owners to reflect the true owners of the CBM. Hale argues that any person or entity who voluntarily undertakes to perform a function may become subject to the duty of acting carefully. The crucial word in this argument, however, is the word "may."

Under Virginia law, to prove a claim for negligence, a plaintiff must show a legal duty, breach of that duty and a resulting injury. *See Chesapeake & Potomac Tel. Co. of Va. v. Dowdy*, 365 S.E.2d 751, 754 (Va. 1988). Furthermore, the issue of whether a legal duty exists is a "pure question of law." *Kellermann v. McDonough*, 684 S.E.2d 786, 790 (Va. 2009). Thus, this court must determine, as a matter of law, whether CNX had any legal duty to supplement its previous filings to update ownership information after the *Harrison-Wyatt, LLC* decision. The Gas Act does require the unit operator to petition the Board for release of escrowed funds in one circumstance: Upon receipt of an affidavit from conflicting claimants affirming that they have reached a voluntary settlement of ownership interests or have received a

final decision rendered by a court or arbitrator as to ownership of the CBM within the unit. The Complaint does not allege that such an affidavit was ever presented to CNX in this case. Furthermore, Hale does not provide the court with any law supporting the imposition of a common law duty under these circumstances other than a duty to speak truthfully. That being the case, I find that Count IV of the Complaint fails to state a claim for negligence, and I recommend that the court grant the Motions as to Count IV.

Count V of the Complaint alleges that CNX has negligently performed its duty to act as a reasonably prudent operator and its duty to market the CBM produced. CNX argues that any duties owed by it are set out by the Gas Act or the Board's pooling orders and that CNX cannot be liable for common law negligence for such. CNX further argues that Hale's remedy for any alleged breach of its obligations under the Gas Act or the Board's pooling orders is in a proceeding before the Board. I have, above, rejected CNX's argument that the Gas Act prevents Hale from asserting common law tort claims against it, and I will not repeat that analysis here. Furthermore, I also have recently held that Virginia courts would recognize an implied duty to act as a reasonably prudent operator, including a duty to market. *See Healy v. Chesapeake Appalachia, LLC, et al.,* 2011 WL 24261, at *14-16 (W.D. Va. Jan. 5, 2011). The Complaint sets forth facts, which, if proven true, would show that CNX violated these duties with resulting damage to Hale. That being the case, I find that Count V adequately pleads a claim for negligence, and I recommend that the court deny the Motions as to Count V.

Count VI of the Complaint purports to state a cause of action for breach of fiduciary duties. A fiduciary relationship exists where "special confidence has been

reposed in one who in equity and good conscience is bound to act in good faith and with due regard for the interests of the one reposing the confidence." *H-B Ltd. P'ship v. Wimmer*, 257 S.E.2d 770, 773 (Va. 1979). The Virginia Supreme Court has recognized that a trustee owes a fiduciary duty to the beneficiary of the trust. *See Broaddus v. Gresham*, 26 S.E.2d 33, 36 (Va. 1943). Furthermore, some courts have recognized that unit operators in forced-pooled units owe a fiduciary duty to the mineral owners. *See Finley v. Marathon Oil Co.,* 75 F.3d 1225 (7th Cir. 1996); *Fransen v. Conoco, Inc.*, 64 F.3d 1481, 1487 (10th Cir. 1995); *Leck v. Continental Oil Co.*, 800 P.2d 224, 228-29 (Okla. 1989). In *Young v. W. Edmond Hunton Lime Unit*, 275 P.2d 304, 309 (Okla. 1954), the Oklahoma Supreme Court reasoned that a unit operator in a forced-pooled unit should be treated as a fiduciary because the operator stood in a position similar to a trustee for all who were interested in the unit's production as either a lessee or royalty owner.

> In these cases, it is the operator's relatively exclusive control and the nonoperators' dependence that require fiduciary responsibilities. Courts that might require factual showings of cooperation or control to treat an ordinary operator as a fiduciary nonetheless have settled per se fiduciary duties on unit operators. Moreover, unit operators are fiduciaries as a matter of law...

John Burritt McArthur, *The Restatement (First) of the Oilfield Operator's Fiduciary Duty,* 45 Nat. Resources J. 587 (Summer 2005). Other courts have rejected any imposition of a fiduciary obligation on the operator absent special circumstances. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1162 (10th Cir. 2000) (predicting "Colorado Supreme Court would not categorize as fiduciary all lessee-lessor relationships involving unitization agreements").

I recently have held that the royalty owners' lack of control over an operator in a voluntary lease case would result in no assurance of ever receiving any benefit of their bargain without imposing an implied duty on the operator to act diligently and prudently. *See Healy*, 2011 WL 24261, at *14-16. It would appear that the further protection of imposing a fiduciary duty on the unit operator would be justified in a forced-pooled case in which the deemed lessors have not chosen the operator, nor have they voluntarily entered into any production agreement. Furthermore, in cases such as this – with conflicting claims of CBM ownership, the Gas Act simply allows the unit operators to pay the contested royalties into escrow without any required accounting or reporting to potential royalty owners. Without any required accounting or reporting, the potential royalty owners can provide no oversight. They are wholly dependent on the CBM producers to truthfully account for the CBM produced and royalties earned from this CBM and to properly deposit the required amounts into escrow. Thus, I believe the Virginia courts would impose a fiduciary duty upon forced-pooled unit operators to properly account for and pay out the royalties owed under these imposed deemed leases. That being the case, I find that the Complaint sufficiently pleads a cause of action for breach of fiduciary duties, and I recommend that the court deny the Motions to dismiss Count VI.

Count VII of the Complaint purports to state a cause of action for unjust enrichment. "Unjust enrichment is an equitable claim arising from the simple principle that 'one person may not enrich himself unjustly at the expense of another.'" *Odyssey Imaging, LLC v. Cardiology Assocs. of Johnston, LLC*, 2010 WL 4781065, at *3 (W.D. Va. 2010) (quoting *Rhinehart v. Pirkey*, 101 S.E. 353, 354 (Va. 1919)). To establish unjust enrichment, a plaintiff must show:

> (1) A benefit conferred on the defendant by the plaintiff; (2) Knowledge on the part of the defendant of the conferring of the benefit; and (3) Acceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value.

*Nossen v. Hoy,* 750 F. Supp. 740, 744-45 (E.D. Va. 1990). "It is only in the absence of an express or of an enforceable contract between parties that the law (whether at law or in equity) will, from circumstances, imply a contract between them." *Ellis & Myers Lumber Co. v. Hubbard*, 96 S.E. 754, 760 (Va. 1918).

As alleged in the Complaint, there is no express contract between the parties in this case; this case involves a forced-pooled CBM unit in which Hale is a deemed lessor. The Complaint alleges that CNX knowingly has taken CBM gas in which Hale has an ownership interest without paying the full amounts owed for it. That being the case, I find that Hale has sufficiently pled a cause of action for unjust enrichment, and I recommend that the court deny the Motions to dismiss Count VII.

CNX also seeks dismissal of Hale's claim for punitive damages. CNX argues that the Complaint fails to state a claim for such damages because, in Virginia, punitive damages may be awarded only when a defendant maliciously or wilfully commits some tort. For the following reasons, I find that Hale has sufficiently pled a claim for punitive damages, and I recommend that the court deny CNX's Motion in this regard.

In *Giant of Va., Inc. v. Pigg*, 152 S.E.2d 271, 277 (Va. 1967), the Virginia Supreme Court explained the circumstances under which punitive damages may be

awarded as follows:

> Punitive . . . damages are allowable only where there is misconduct or actual malice, or such recklessness or negligence as to evince a conscious disregard of the rights of others. They are allowed not so much as compensation for plaintiff's loss, as to warn others and to punish the wrongdoer, if he has acted wantonly, oppressively, or with such malice as to evince a spirit of (mischief) or criminal indifference to civil obligations. Wilful or wanton conduct imports knowledge and consciousness that injury will result from the act done.

(citations omitted). The Virginia Supreme Court has defined "willful and wanton negligence" as:

> acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another.

*Griffin v. Shively*, 315 S.E.2d 210, 213 (Va. 1984).

I have found above that the Complaint sets forth sufficient facts to state claims for the torts of trespass and conversion. The Complaint further alleges that CNX knowingly and purposefully underpaid the royalties owed. Taking Hale's allegations contained in the Complaint as true, as I must, I note that the trespass and conversion by CNX was not based on mistake, but was intentional. I find such allegations suffice to state a claim for punitive damages, at least at this stage of the proceedings, and I recommend that the court deny CNX's Motion on this ground.

The defendants further argue that all of Hale's claims, other than his claim for breach of fiduciary duties, are barred by the statutes of limitations or the doctrine of

laches. In particular, the defendants argue that Hale's claims for declaratory judgment, trespass, conversion, negligence and unjust enrichment are barred by the doctrine of laches. "The doctrine of laches involves the failure of a party to assert a known right or claim for an unexplained period of time resulting in prejudice to the adverse party." *1924 Leonard Road, L.L.C. v. Van Roekel*, 636 S.E.2d 378, 387 (Va. 2006). "The burden of proving this defense rests with the party asserting it." *1924 Leonard Road, L.L.C.*, 636 S.E.2d at 387. CNX argues that the most recent of the pooling orders affecting Hale's property was entered more than eight years ago. CNX claims that it will be prejudiced if the court allows Hale to pursue these claims after it has invested years of effort and "hundreds of thousands of dollars establishing and drilling gas wells to produce CBM from the subject propert[ies]." (Memorandum In Support Of Defendant's Motion To Dismiss Plaintiff's Complaint Pursuant To Federal Rules Of Civil Procedure 12(b)(1), 12(b)(6) and 12(b)(7), (Docket Item No. 30) ("CNX's Memorandum") at 31.) It appears, however, that the laches defense is raised in response to Hale's claim that he and other "deemed lessors" would be entitled to 8/8ths of the net proceeds of a forced-pooled well after a determination of ownership of CBM rights. This argument has been rejected above, and the defendants provide no argument to the court that Hale's claims based on allegations that CNX has not properly accounted for all the gas produced from these wells or has not paid the full amounts for royalties due into escrow are barred. That being the case, I recommend that the court reject this argument and deny the Motions on this basis.

The defendants also argue that Hale's claims for trespass, conversion, negligence and unjust enrichment are barred, in whole or in part, by the five-year statute of limitations for injury to property, found in Virginia Code § 8.01-243(B), or for breach of written contract, found in Virginia Code § 8.01-246(2), or the three-year

statute of limitations for unjust enrichment found in Virginia Code § 8.01-246(4). In particular, the defendants argue that any alleged trespass occurred when the gas wells drilled pursuant to these pooling orders went on line and began producing CBM. CNX asserts that the most recent of these wells began producing CBM no later than January 25, 2001. The defendants also argue that Hale's negligence claims based on CNX's actions in preparing and submitting these forced-pooling applications to the Board accrued when these application were filed. CNX asserts that the most recent of these applications was filed in September 2000. The defendants also argue that Hale's claims for unjust enrichment accrued when it first paid only a 1/8th royalty into escrow.

Again, it appears that the defendants' argument with regard to the statute of limitations is based on Hale's claims to 8/8ths of the net proceeds of these wells, and this claim has been rejected above. It also appears that the defendants' argument ignores one very important fact with regard to the laches or statute of limitations defense. The defendants, themselves, assert that the Virginia Supreme Court's 2004 decision in *Harrison-Wyatt, LLC*, did not establish that Hale owns the CBM estates relevant to these pooling orders. If that is the case, Hale's rights of actions for these claims could not accrue until it is established that he has an ownership interest in the CBM, an issue that remains to be determined in this case.

The Virginia Supreme Court has long held that the statute of limitations cannot begin to run with regard to a property claim prior to the plaintiff having a property right that could be legally enforced. *See Hope v. Norfolk & W. R.R. Co.,* 79 Va. 283 (1884) (citing *Ball v. Johnson's Ex'r,* 8 Gratt. 281 (1851) (statute of limitations did not commence to run against the owners of the remainder until the death of the holder

of the life estate because until termination of life estate, remainder men had not cause of action to recover property)). Furthermore, Virginia courts have recognized that in tort actions there has been an injury suffered. *See Sides v. Richard Mach. Works, Inc.,* 406 F.2d 445, 446 (4th Cir. 1969). Under the Gas Act, before a claimant has an enforceable right to proceeds placed in escrow, he must show an ownership interest in the CBM. *See* VA. CODE ANN. § 45.1-361.22(5). It is, therefore, hard to understand how Hale's right of action for any claim resulting from a failure of CNX to properly account for the CBM produced or properly deposit the full amounts of the royalties owed into escrow, accrued prior to the establishment of his ownership interest in the CBM at issue. Also, the Gas Act does not require a termination of ownership to be sought or issued within any particular time frame. Therefore, I recommend that the court reject this argument and deny the Motions on this basis.

The defendants also argue that Hale's claim seeking a declaratory judgment regarding ownership of the CBM should be dismissed for failing to join all necessary parties under Federal Rule of Civil Procedure 12(b)(7). In particular, the defendants argue that Hale's request in Count I for entry of a declaratory judgment that coal owners do not own the rights to CBM without a specific express grant of those rights should be dismissed because all the necessary coal owners have not been joined as party defendants as required by Federal Rule of Civil Procedure Rule 19. Hale's counsel concede that all the coal owners in CBM wells operated by CNX and having conflicted claims of ownership must be added before judgment is entered, if it is to be effective against them. Hale's counsel, however, argue that they have named the coal owner in the five pooled units at issue in this case, Torch, as a party defendant. Hale's counsel also argue that they have named the unknown coal owners in all pooled units operated by CNX as John Does A-Z and ask to be allowed to conduct discovery

before being required to identify and serve additional specific named coal owners.

Thus, there is no dispute that each of the coal owners in forced-pooled units operated by CNX where conflicting claims of ownership exist are necessary and indispensable parties before class action judgment may be entered. The issue is how and when this must be accomplished. Therefore, the court must decide whether this case should be dismissed because all such coal owners have not been added as named party defendants at this stage. CNX argues that the use of a John Doe defendant is allowed when the only way plaintiff can obtain a defendant's identity is through discovery. CNX argues that the use of John Doe defendants is not permitted where a plaintiff could obtain the defendants' identities through reasonable inquiry. CNX argues that, in this case, the identity of all the coal owners in all forced-pooled units operated by CNX where conflicting claims of ownership exist can be determined by examination of the Board's records.

Hale, on the other hand, argues that a manual review of all of the Board's files involving forced-pooled units operated by CNX where conflicting claims of ownership exist would be time-consuming and expensive. Hale argues, instead, that he should be allowed to serve discovery on CNX to discover the identity of these parties based on counsel's belief that CNX likely has an electronic database or other record which lists the identity of each of these coal owners.

The federal courts are hesitant to dismiss for failure to join a party, and, in general, a dismissal will be granted only when the defect cannot be cured. *See Sever v. Glickman*, 298 F. Supp. 2d 267, 275 (D. Conn. 2004). If a dismissal is granted, it should be granted without prejudice to refiling with the proper parties. *See Dredge*

*Corp. v. Penny*, 338 F.2d 456, 464 (9th Cir. 1964). Furthermore, the moving party has the burden of persuading the court that dismissal is proper. *See Davis v. United States*, 192 F.3d 951, 958 (10th Cir. 1999).

In this case, both parties admit that the identities of those currently named as John Doe defendants are available and that Hale would be able to amend his pleadings to add those named parties. The parties argue only over whether Hale should be forced to identify these parties and make the amendment prior to conducting any discovery in the case. The case law is replete with the courts' recognition that courts should take a pragmatic approach to deciding motions to dismiss for failure to join a party. *See Prescription Plan Serv. Corp. v. Franco*, 552 F.2d 493, 496 (2nd Cir. 1977) (citing *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102 (1968)). That being the case, I recommend that the court deny the Motions insofar as they seek to dismiss Hale's claims at this stage for failure to name each of the individual coal owners. Whether or not Hale will be allowed to discover this information from CNX will be an issue for the court to decide based on the burden posed by the discovery and the availability of the information otherwise.

## PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.    The court should deny the Motions insofar as they seek dismissal of the Complaint for lack of subject matter jurisdiction pursuant to Federal

Rule of Civil Procedure 12(b)(1);

2. The location of the phrase "subject to a final legal determination of ownership" immediately following the word "deemed" in § 45.1-361.22 was not intended by the General Assembly to conditionally impose CBM forced-pooled deemed leases only until such time as a final legal determination of ownership of the CBM;

3. The language "subject to a final legal determination of ownership" in § 45.1-361.22 simply recognizes that any party's interest under a deemed lease is subject to a final legal determination of ownership of the CBM;

4. The court should grant the Motions insofar as to dismiss those portions of Count I of the Complaint that seek a judgment for 8/8ths of the net proceeds from these wells;

5. The Gas Act does not require CNX to deposit all proceeds from its forced-pooled CBM wells, net ongoing operational expenses, into escrow as a "participating operator;"

6. Prior to the adoption of the Gas Act, Virginia courts recognized the common law "rule of capture" with regard to oil and gas;

7. The Gas Act does not take property from landowners, but rather gives the landowners a right to receive a proportional share of the value of oil and gas taken from under their property by adjacent landowners;

8. The court should grant the Motions insofar as to dismiss those portions of Count I of the Complaint that seek a declaratory judgment holding the Gas Act unconstitutional;

9. Hale's common law claims against CNX are not barred because Hale failed to exhaust administrative remedies under the Gas Act;

10. The Complaint pleads sufficient facts to state a cause of action for trespass, and the court should deny the Motions as to Count II;

11. The Complaint pleads sufficient facts to state a cause of action for

conversion, and the court should deny the Motions as to Count III;

12.     The Complaint fails to state a claim for negligence in Count IV, and the court should grant the Motions as to Count IV;

13.     The Complaint pleads sufficient facts to state a cause of action for negligence against CNX for failing to act as a reasonably prudent operator and for failing to market the CBM produced from these wells, and the court should deny the Motions as to Count V;

14.     Virginia courts would hold that forced-pooled CBM well unit operators have a fiduciary duty to properly account for and pay into escrow the royalties owed CBM owners under deemed leases;

15.     The Complaint pleads sufficient facts to state a cause of action for breach of fiduciary duties, and the court should deny the Motions as to Count VI;

16.     The Complaint pleads sufficient facts to state a cause of action for unjust enrichment, and the court should deny the Motions as to Count VII;

17.     The Complaint pleads sufficient facts to state a claim for punitive damages, and the court should deny the CNX's Motion on this ground;

18.     The court should deny the Motions insofar as they seek to dismiss Hale's claims as being barred by the statute of limitations or the doctrine of laches; and

19.     The court should deny the Motions to dismiss Hale's claims for failure to name each of the individual coal owners.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court grant the Motions in part and deny the Motions in part.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(c):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record.

DATED: This 21st day of January, 2011.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE