UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | | |
|---|---|---|
| JEFFREY CARLOS HALE, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:10-cv-59 |
| v. | ) ) | |
| CNX GAS COMPANY LLC, et al., | ) ) | |
| Defendants. | ) ) | |
| DORIS BETTY ADDISON, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:10-cv-65 |
| v. | ) ) | |
| CNX GAS COMPANY LLC, et al., | ) ) | |
| Defendants. | ) | |

**DEFENDANT CNX GAS COMPANY LLC'S RESPONSE TO THE MOTION FOR APPROVAL OF CLASS NOTICES AND
NOTICE PROGRAM AND AMENDMENT OF CLASS DEFINITION**

CNX Gas Company LLC ("CNX"), by and through its undersigned counsel, states as follows in support of its Response to the Motion for Approval of Class Notices and Notice Program and Amendment of Class Definition.

**INTRODUCTION**

Plaintiffs' Motions for Approval of Class Notices and Notice Program and Amendment of Class Definition (the "Notice Motions") set forth a notice plan and proposed notices that do not meet the minimum requirements of due process and Federal Rule 23(c)(2).  Here, the Court cannot properly evaluate the notice plan because it lacks the most basic requisites of Rule 23 as

1

set forth in the Federal Judicial Center's "Judge's Class Action Notice and Claims Process Checklist" ("FJC Checklist").[1]

CNX believes the notice program is deficient for at least the following reasons. *First,* the proposed notice program fails to meet the requirement of Rule 23 that individual notice be given to class members who can be identified with reasonable effort. Plaintiffs have failed to identify the class members as required in the Court's certification order, and apparently do not intend to do so. *Second*, the publication notice proposed by Plaintiffs is insufficient to reach the class members. Specifically, Plaintiffs have ignored the evidence that numerous class members reside outside of the publication area that they propose to the Court. Plaintiffs' expert has testified that she never even looked at the names or addresses of known class members in reaching the conclusion that paid media publication should be limited to the area around southwestern Virginia. *Third*, the content of the notices themselves is insufficient given misstatements about attorney fees, the ability to opt-out of Rule 23(b)(2) claims, and the failure to include information about counterclaims and defenses. *Fourth*, the proposed "advisory" notice to coal owners is entirely inconsistent with the theory of the case espoused by Plaintiffs in order to receive class certification and therefore it is unnecessarily confusing and should not be issued. CNX continues to assert that the coal owners are *necessary parties to the litigations* and merely issuing an advisory notice does not resolve the significant due process concerns created by their absence. Finally, this Court should not amend the *Addison* class definition to include a group of people for whom Ms. Addison is not representative. Each of these arguments is set forth in more detail herein.

---

[1] The Federal Judicial Center, where Plaintiffs' expert Dr. Wheatman previously worked, has published its guidelines here: http://www.fjc.gov/public/pdf.nsf/lookup/notcheck.pdf/$file/notcheck.pdf (last accessed 4/2/2014).

I.   **The Plan Fails to Provide for Individual Notice to Persons Who Can Be Identified with Reasonable Effort.**

a.   **Individual Notice is Required Under Rule 23.**

"Individual notice must be sent to all class members whose names and addresses may be ascertained through reasonable effort." *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 173 (1974). Plaintiffs bear the burden to show that potential class members are not reasonably identifiable such that publication notice is sufficient instead of individual notice. *See* FJC Checklist at 2; *see also Schroeder v. City of New York*, 371 U.S. 208, 212-13 (1962) (Generally speaking, "notice by publication is not enough with respect to a person whose name and address are known or very easily ascertainable and whose legally protected interests are directly affected by the proceedings in question."); *Oscar Gruss & Son v. Geon Indus., Inc.*, 89 F.R.D. 32, 37 (S.D.N.Y. 1980) ("As the Supreme Court has interpreted Rule 23(c)(2), 'notice by publication is not enough with respect to a person whose name and address are known or very easily ascertainable and whose legally protected interests are directly affected by the proceedings in question.'") (citing *Schroeder*, 371 U.S. at 212-13). When notice is required, "process which is a mere gesture is not due process…[t]he means employed must be [] one desirous of actually informing" the person to whom notice is due. *Eisen*, 417 U.S. at 174 (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950)).

In *Eisen*, the Supreme Court upheld the reversal of a district court's ruling that because two million out of six million possible members could be identified only at enormous expense, a smaller amount of individual notice to identifiable class members was acceptable in addition to publication. 417 U.S. at 173-77. Because there were ascertainable class members, constitutional due process mandated that individual notice be sent to each - irrespective of cost. *Id.* Where names and addresses are identifiable, "[t]he time and expense of gathering their names and

addresses is a necessary predicate to providing each with notice of the action's pendency without which the action may not proceed." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1102 (5th Cir. 1977).

When a party is identified in a publicly recorded instrument, constructive notice by publication alone is insufficient. *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798 (1983). Notice must be given by mailing to the member's last known available address or by personal service. *Id.*; *see also Schroeder*, 371 U.S. at 212-13 (holding that published and posted notices was not sufficient and violated the Due Process Clause of Fourteenth Amendment; party had to, at a minimum, mail notice to the landowner); *Walker v. City of Hutchinson*, 352 U.S. 112, 116 (1956) (requiring personal notice to landowner when landowner's name was known and on official records); *In re Domestic Air Transp. Antitrust Litig.*, 141 F.R.D. 534, 539 (N.D. Ga. 1992) (requiring individual notice where class member names and addresses are available from business or public records).  .

## B. Plaintiffs' Attempts to Avoid Individual Notice are Insufficient.

A proper notice plan should spell out how notice will be accomplished, and why the proposed methods were selected. If individual notice will not be used to reach everyone, be careful to obtain a first-hand detailed report explaining why not.

FJC Checklist, at 1.

Plaintiffs' notice plan is premised upon a fundamental error because it lacks a plan to even attempt to identify all class members and determine the actual feasibility of giving individual notice.  Judge Sargent found in her Report and Recommendation recommending certification of the classes that the current owners of the gas estates "would be ascertainable by reference to objective criteria, i.e. local land records." Report and Recommendation (*Hale* ECF 272) at 62.  Judge Sargent also held that Rule 23(b)(3) manageability requirements were met

4

because "the most difficult task will be identifying the members of the Rule 23(b)(3) classes to

provide the notice required under Rule 23(c)(2)(B)" and changes affecting ownership "are

generally recorded and trackable." *Id*. at 76. The notice plan not only fails to cite, or even

acknowledge, this language, it also fails to provide the Court any data from which the Court can

conclude that individual notice would not be practicable in these cases.[2]

One of the first questions asked by the FJC Checklist is: "Did you receive reliable

information on whether and how much individual notice can be given?" FJC Checklist at 2.

Because, "[i]f names and addresses are reasonably identifiable, Rule 23(c)(2) requires individual

notice." *Id*. The FJC Checklist specifically directs the judge to distinguish between truly

unreasonable searches and difficult and expensive but not unreasonably burdensome searches,

because Rule 23 generally requires the latter. *Id*. at 3. Thus, the plan should include how the

lists will be compiled, how addresses will be updated, how accurate the list will be after

updating, and what percentage of the class will be reached by individual notice, and procedures

for dealing with notices returned as undeliverable. *Id*. at 3.

Naturally, CNX expected the plan would explain either (1) that Plaintiffs *had done* the

work of updating the class list from CNX's Board filings and the Board orders and bringing

ownership forward through public or other records, and then how that list would be used as to the

elements in the FJC Checklist; or (2) how Plaintiffs *planned to do* the work of updating the list,

along with the other elements in the FJC Checklist. At the very least, CNX expected that the

partial list that Plaintiffs would generate as a starting point for the identification of class

members would contain the individuals listed on the operative pooling orders instead of an

---

[2] Dr. Wheatman testified that she was aware of this language but it did not factor into her recommendations. *See* Deposition Transcript of Dr. Wheatman (dated March 25, 2014) not yet signed by Dr. Wheatman (attached hereto as Exhibit 1) at 65:20-67:5.

undefined list that is missing names of class members who are identified on CNX's filings to the Board.  Plaintiffs' incomplete "list" is attached hereto at Exhibit 2.

Instead, it is now apparent that Plaintiffs have not yet done the work necessary to ascertain membership in the class in preparation for class notice and have identified no plan to do so at any point.  When Plaintiffs' notice expert and the designer of their notice plan, Dr. Wheatman, was deposed, she testified that she had never looked at the data identifying class members that Plaintiffs sent to her.  Exhibit 1, Dep. 9:14-18.  Instead, she assumed that the partial list provided was the best data available and relied on that assumption.  *Id.* at 135:2-4; *see also* Exhibit 2.  Specifically, she testified that the Plaintiffs asked her to design the notice program based only on the mailing lists that she was given.  Exhibit 1, Dep. 164:19-22 ("We were asked to design a notice program based on the fact we have these mailing lists.  And that's what we did.").  So Dr. Wheatman did nothing to determine the feasibility of ascertaining class members through local land records, *id.* at 165:1-5, nor any feasibility analysis using land or ownership records to update ownership, *id.* at 166:2-12.  And, she did not disclose this constraint in her declaration.[3]

In place of a feasibility analysis of how individual class members could be located, Plaintiffs' motion simply misstates that "it is impossible to trace through public records the identity of those who obtained ownership after the information was compiled." Notice Motions at 4. Plaintiffs' notice expert also claims that "current gas owners cannot be traced through public records because the locations of the gas wells are not identified."  Wheatman Declaration (*Hale* ECF 362-1) at ¶ 17.  When asked at her deposition what affect the location of the gas wells

---

[3] "Courts must be wary, and experts must be careful.  A notice expert who implements a negotiated program and is not able to deem that program to be the best practicable, must avoid opinion statements that could mislead the court into thinking that it had received unbiased expert recommendations and evidence."  Todd B. Hilsee, Gina M. Intrepido, and Shannon R. Wheatman, *Hurricanes, Mobility, and Due Process: The "Desire-to-Inform" Requirement for Effective Class Action Notice is Highlighted by Katrina*, 80 Tul. L. Rev. 1771 at 1806 (2006).

would have on determining ownership, she admitted that she did not know and had relied on information from an analyst at Rust Consulting who came up with this conclusion. *See* Exhibit 1, Dep. 95:11-14; *see* Wheatman 452 (attached hereto as Exhibit 3) (Tore Hodne from Rust Consulting concluding that "we are not able to trace to confirm ownership since the addresses we have are mailing addresses. We don't have well location and I don't believe the trace process would return gas rights owners anyways.") To the extent well locations are even relevant to this inquiry, Plaintiffs have since admitted that the well locations are available from every single Board order. Pla. Motion for a Protective Order (*Hale* ECF 380) at 3, n.2.

Dr. Wheatman admitted that she was in unchartered territory for this unique case (Exhibit 1, Dep. 31:12-17), but Plaintiffs have yet to explain why notice in these cases as class actions should not, at least, be handled similarly to a single case involving a dispute over property rights. If this were a single case, counsel for the plaintiff would conduct a title search or set forth the chain of title and serve all persons who could be found. *See, e.g. Heirs of Richard Deskins v. Consol Energy, Inc.,* Case No. 1:11-cv-00069 (W.D. Va.) ECF 52, Second Am. Compl, at pp. 1-10. Those who could not be found would be served by publication, based on an affidavit that diligence had been used without effect to ascertain the location of such persons. *See* Va. Code Ann. § 8.01-316(A)(1)(b). If there were or might be persons who are interested in the subject matter who cannot be identified, the nature of their interest is described and they might be made defendants as "parties unknown." *See* Va. Code Ann. § 8.01-316(A)(2). Lawyers err on the side of inclusion, because the incremental cost of adding an additional party who may have an interest is marginal, but the adverse effect on enforceability of the judgment if a party is omitted can be serious, even dispositive. *See, e.g.*, *Asch v. Friends of Community of Mount Vernon Yacht Club*,

251 Va. 89, 90-91, 465 S.E.2d 817, 818 (1996) (court lacks the power to proceed with suit unless all necessary parties are before the court).

Plaintiffs' argument in prior briefing that their notice plan "exceeds the notice efforts that CNX itself provides to Class members" is irrelevant and misses the point.  Pla. Opp. to CNX's Motion for Extension of Time to Respond to Pla. Motion for Approval of Class Notices (*Hale* ECF 367) at 3.  Va. Code Ann. §§ 45.1-361.22 and 361.19 are different than Rule 23.  CNX and the Board met the requirements of the Virginia Gas and Oil Act but Plaintiffs, here, do not meet the requirements of Rule 23.  Here, the Court has already ruled that the class members can be identified by bringing down the title from the existing lists.  Report and Recommendation at 62, 76.[4]  Individual notice is required to all members who can be identified through reasonable effort.  Fed. R. Civ. P. 23(c)(2)(B).  Thus, the Court has already defined, in part, what is reasonable effort.  It would also include further reasonable steps if individual notice by mail is returned.  *See Jones v. Flowers*, 547 U.S. 220, 230 (2006).  Only those class members whose names and addresses cannot be ascertained after reasonable effort[5], but who are within the class description, should be served by publication.  The method must be "such as one desirous of actually informing the absentee might reasonably adopt to accomplish it."  *Id*. at 229.  These requirements may not be relaxed based on high cost.  *Eisen,* 417 U.S. at 175-76.

Furthermore, the notice plan does not provide any steps to identify addresses for class members who CNX listed on its filings with the Board, and the Board orders, where there are no

---

[4] Dr. Wheatman testified that she read that changes in ownership "are generally recorded and trackable" but that "didn't factor into [her] recommendations." Exhibit 1, Dep. 66:11-67:5.  Dr. Wheatman testified further that she is aware of tools that can be used to find addresses of the class members. *Id*. at 50:1-51:2.  But where she is designing a plan, in her opinion, it is not necessary to use those tools because her firm can use paid media notice. *Id*. at 51:11-17. Because her company does not do the work to find addresses, she always recommends paid media to reach persons where they do not have complete addresses. *Id*. at 51:19-52:8. In her opinion, it does not matter how heirs are listed because they are going to be reached through paid media notice. *Id*. at 79:21-80:7.  For Dr. Wheatman, "this level of detail with the actual data isn't something [she] ever get[s] into." *Id*. at 80:8-9.

[5] Irrespective of title searches, reasonable efforts include internet searches, contacting heirs, and going to the local record room to determine if names and addresses can be ascertained.

addresses listed.  To be clear, the calculations done by Rust Consulting, who worked with Dr. Wheatman in preparing the notice plan, estimated that almost *30% of the gas owners* from the incomplete lists provided by Plaintiffs, and almost *50% of the coal owners*, have unknown addresses.  *See* Exhibit 3 at Wheatman 449.  Dr. Wheatman testified that in her experience, no effort is made to find addresses for class members whose names are known.  Exhibit 1, Dep. 44:6-45:1.  However, the FJC Checklist says the plan should detail steps to update addresses before mailing.  FJC Checklist at 3.[6]

Despite the law's preference for individual notice, and the age of some of the addresses at issue, Plaintiffs' notice plan is built on the premise that paid media notice is sufficient.  Without any specific analysis of why individual analysis would not be feasible, Dr. Wheatman testified that publication notice is preferable to cover class members with unknown addresses, even though she admitted that there are tools that can be used to find addresses for class members. Exhibit 1, Dep. 50:5-51:9.

Crucially, the notice plan relies on all of these assumptions without ever analyzing the partial list of class members created by Plaintiffs, how it was created, or whether it was complete.  Dr. Wheatman testified that she did not know the form of the data, or who had created the lists, and that she had never opened up the lists to view them.  *Id.* at 161:10-19.  She did not investigate or understand that there are multiple different types of board orders, and did not know whether the list contained all or some of the names from those different orders over time. *Id.* at 162:7-10.  Because the current certified class definitions include "*[e]ach person*, or their successors-in-interest …identified by CNX…*according to filings* made by CNX with the Virginia Gas and Oil Board ("the Board") *and/or according to orders* entered by the Board

---

[6] This position does not appear to be consistent with her company's advertised services on its website.  *See* "We Identify and Locate Potential Class Members with Proprietary Research Methods" http://www.kinsellamedia.com/Services/Class_Member_Research.aspx (last accessed 4/2/2014).

pursuant to CNX's filings," with the exceptions and exclusions noted by the Order, the operative

Board Order should be identified and efforts should be made to update the names and addresses

to include successors-in-interest. *See* Order Certifying Class (*Hale* ECF 305) at 2 (emphasis

added). These lists can change substantially over time.

For example, consider Unit AZ109, which CNX has previously drawn to the attention of

the Court and Plaintiffs.  The list of names provided by Plaintiffs appears to have been generated

from the March 2005 Supplemental Order (attached hereto as Exhibit 4).  *Cf.* Exhibit 4 with

Exhibit 2 at 72.  However, there was a Repooling Order in January 2012 (attached hereto as

Exhibit 5) which lists numerous new gas owners who did not appear on the March 2005

order. Some of the gas owners listed in the January 2012 Order are now not current or operative

because of the January 10, 2014 Virginia Supreme Court decision in *CNX Gas Company LLC v.*

*James Rasnake, et al*.  But other gas owners listed in the January 2012 Order were not affected

by that decision and show the deficiencies in not using the operative order and not updating title.

Tract #1F is a prime example. *Cf.* Exhibit 5 at 38-39 *with* Exhibit 2 at 72. Plaintiffs do

not list Bobby Blankenship, Geneva Baldwin Heirs, Devisees, Successors or Assigns, Bernice

Blankenship, Phyliss Blankenship or Fred Blankenship in their list of potential class members,

but they are found in the January 2012 Order. They identify Charlotte Peck in their list of

potential class members.  See Exhibit 2. There is a Charlotte Peck from the March 2005 Order.

See Exhibit 4. But Charlotte Peck is most likely now Charlotte Tucker who is not listed in the

Plaintiffs' list of potential class members but is listed in the January 2012 Order. See Exhibit

5.  And Charlotte Tucker not only has a new last name but she has a different address in January

2012 than she did in March 2005.

In addition, the January 2012 Repooling Order lists numerous title conflicts between potential gas owners, as well as potential owners of CBM in conflict with gas owners and the coal owners. *See, e.g.,* Exhibit 5 at 40, Tract 1G. Who is the gas owner? The Commonwealth of Virginia or the heirs of Otis J. Fields? The notice does not inform potential gas owners with conflicts within the gas estate of their title conflict or the need to resolve that conflict to have the issues Plaintiffs' counsel seeks to resolve in this case have effect. Or how or when this would be accomplished? Dr. Wheatman's response is simply that she would provide over-notice. Exhibit 1, Dep. 77:6-79:19. Does the notice really inform those individuals of the issues in the case or what they may face?

These examples are from one unit whose last Order was from almost two and a half years ago. They are from a unit that has been highlighted to the Court and Plaintiff's counsel throughout this litigation. It begs the questions of who was included on Plaintiffs' list for all of the units, and what has occurred with the owners listed for those units in the intervening time since the issuance of whatever order Plaintiffs selected. Furthermore it draws into question whether the notice is sufficient to provide clear information about the potential rights of individuals with title conflicts within the gas estate.

Plaintiffs should disclose precisely how their incomplete list was generated and then this Court should order them, at the very least, to create a list for individual notice that includes all of the names from the operative Board order, brought forward to the present as specified in the certification order. Notice should not be approved until this has been accomplished, reviewed, and approved.

Plaintiffs have not reached even the first step of ascertaining membership in the class, which is to identify the class members so that they can then provide the required individual

notice.  In seemingly an effort to restrain the costs of the notice program, Plaintiffs have ignored clear jurisprudence which requires this Court to provide individual notice where class members are ascertainable - irrespective of cost.  *See Eisen,* 417 U.S at 173-77.   Plaintiffs' notice plan must be amended to be based on an actual list of class members and not assumptions regarding the same.

## II.     Plaintiffs Also Failed to Do The Work Required For A Proper Publication Notice Program.

This Court should order Plaintiffs to present a notice plan with a publication notice component that conforms to the standards in the FJC Checklist, and that Dr. Wheatman has previously addressed in her professional publications.  Publication to absent or unknown class members must be based on a demographic analysis of the composition of the class.  The FJC Checklist says: "The notice plan should include an analysis of the makeup of the class."  FJC Checklist at 2.  It also asks: "Is the notice plan conducive to reaching the demographics of the class?"  *Id.*  Dr. Wheatman has written:

> The overarching goal of any notice program is to effectively reach the class so that class members have a 'meaningful' opportunity to be heard. Rule 23 can 'comport with constitutional standards of due process only if there is a maximum opportunity of notice to the absentee class members . . . .' Each class action requires a notice program tailored to the specifics of the case. Factors such as the distribution or consumption of a product or service, the number of readily identifiable class members, the anticipated class size, the demographics of class members, and the geographic location of class members influence the direction and scope of a notice program.

K. Kinsella and S. Wheatman, Class Notice and Claims Administration (internal footnotes omitted).[7]  The Court will note that among the items absent from plaintiffs' notice plan are (1)

---

[7]

http://www.kinsellamedia.com/Knowledge_Sharing/Articles_Publications/articleType/ArticleView/articleId/67/Class_Notice_and_Claims_Administration.aspx (last accessed 4/2/2014)

the number of readily identifiable class members; (2) the anticipated class size; (3) the demographics of the class members and (4) the geographic location of the class members.

Here, as discussed above, Dr. Wheatman designed the publication portion of the notice campaign without having first developed a class list, or even looking at the partial list provided by Plaintiffs. Exhibit 1, Dep. 9:14-18; 86:22-87:2. She does not know how many class members live in Virginia, or outside of Virginia. *Id.* at 87:11-17. Instead, to determine where class members would be, she looked only at the seven county area where the relevant properties were located. *Id.* at 84:20-22. Dr. Wheatman then assumed, without analysis, that the class members who would not receive individual notice would have the demographics of homeowners living in the seven county area and that publication in the media markets around these counties would be sufficient. *See* Wheatman Declaration (*Hale* ECF 362-1) ¶ 25. She does not explain why she concluded that "homeowners" are the "best surrogate" for absent class members. She merely states this in conclusory fashion. *Id.*

To determine appropriate publication notice, Plaintiffs need at least to analyze the demographics of the class members who are actually and already known in this case. Dr. Wheatman testified that her firm has never done anything like that. Exhibit 1, Dep. 176:6-14.[8] More than one-third of the class members with known addresses on Plaintiffs' list reside outside of Virginia. The natural inference is that at least one-third of the class members with unknown addresses reside outside of Virginia. While Dr. Wheatman suggested that the local newspapers that will circulate the notices "may" also carry the notice online, she also testified that for her selected demographic, internet use is very low. *Id.* 155:3-4.

---

[8] Todd Hilsee, with whom Dr. Wheatman previously worked, said that obtaining data-specific information for a particular class is "not a time-consuming process. It's done – when we work with the parties we do it in a matter of weeks in preparing for submission of a sophisticated notice program. It can be done in a fairly short time frame. …We do it in all of our notice programs. I think the courts need to have this information available." Todd Hilsee, *FTC Workshop: Protecting Consumer Interests in Class Actions*, 18 Geo. J. Legal Ethics 1223, 1229 (2005).

In a case where Plaintiffs are proposing the use of potentially decades-old addresses to provide class notice, and for individuals and heirships for whom no addresses could be generated twenty years ago, and without doing up-to-date ownership searches, the specifics of publication notice are extremely important.  The Court should require Plaintiffs to analyze the geographic spread of known class members and provide publication notice that matches that geographic reach, which CNX believes is nationwide.

### III.    Plaintiffs' Proposed Notice Plan Lacks Any Reach Analysis.

"Reach" of the notice plan is one of the "Major Checkpoints" in the FJC Checklist.  FJC Checklist at 1.  One of the questions is whether a high percentage of the class can be "reached" (i.e., exposed to notice).  *Id*.  The FJC Checklist continues: "Has the percentage of the class to be reached by mail been calculated?  The parties should be able to indicate how great a percentage of the overall class will be reached by individual notice, so that the extent of any necessary additional notice can be determined."  *Id*. at 3.  The Court will note that these calculations are wholly absent.

The effectiveness of a notice plan is based on reach calculations.  The FJC Checklist called this "[t]he lynchpin in an objective determination of the adequacy of a proposed notice effort."  *Id*. at 3.  The FJC Checklist asks whether reach calculations are based on accepted methodology, and whether the net reach calculation is thorough, conservative, and not inflated. *Id*.  Here, Plaintiffs have no plan to do even what the Court required in terms of identifying, much less notifying, class members.  Despite the FJC guidelines, Dr. Wheatman testified that until the notice was mailed, she did not know how to project the anticipated reach.  Exhibit 1, Dep. 184:4-7.  *See* FJC Checklist at 1 ("The percentage of the class that will be exposed to a notice based on a proposed notice plan *can always be calculated* by experts.") (emphasis added).

Waiting to project reach until after notice is given is contrary to the notice practices described in articles authored by Dr. Wheatman herself.  An article co-authored by Dr. Wheatman explained:

> [C]ommunications experts routinely perform calculations to show what percentage of a group of class members *will be reached* by a communications program.  This information, prepared by credible and knowledgeable experts, should be given to court *before they adopt and employ* a certain method of notice. …
>
> Without the percentage calculation, the effect of tactics proposed in a notice plan is subject to guesswork.  Ignoring this information is akin to ignoring DNA evidence in a murder case.

Todd B. Hilsee, Shannon R. Wheatman & Gina M. Intrepido, *Do You Really Want Me to Know My Right? The Ethics Behind Due Process in Class Action Notice Is More Than Just Plain Language: A Desire to Actually Inform* 18 Geo. J. Legal Ethics 1359 at 1364 (emphasis added).

> Based on this prevalence [of usage by media and advertising professionals], courts should be regularly presented with data and calculations – *at the outset*, conservatively performed by qualified experts and professionals – which would *verify the adequacy of a proposed outreach program* for a notice campaign.

*Id*. at 1372 (emphasis added).  Dr. Wheatman's more recent article described the importance of providing this information to the court as an "imperative" step.  80 Tul. L. Rev. at 1795-96.  Proceeding without such data "can result in disaster."  18 Geo. J. Legal Ethics at 1373.

Here, not only did Dr. Wheatman not calculate the projected reach, she did not even discuss reach as a concept, even though her own articles and the Federal Judicial Center guidelines emphasize its key role in evaluating any notice plan.  Dr. Wheatman testified that she did not disclose the concept of reach to the Court in her declaration because she was not representing a reach figure.  Exhibit 1, Dep. 183:4-7.[9]

---

[9] E-mails produced by Dr. Wheatman show that her firm was attempting to calculate reach percentages prior to submitting the plan.  *See* Exhibit 3.

Once again, the notice plan lacks the most fundamental content necessary to evaluate its validity and effectiveness.

## IV.     The Content of the Notices Does Not Satisfy Rule 23.

To satisfy Rule 23's requirement of the best notice practicable under the circumstances, it is not only necessary that the notice must reach parties affected by the litigation, but the notice must actually convey the required information. *Nissan*, 552 F.2d at 1103 (citing *Mullane*, 339 U.S. at 314). "Surely 'the best notice practicable under the circumstances' cannot stop with these generalities. It must contain an adequate description of the proceedings written in objective, neutral terms, that, insofar as possible, may be understood by the average absentee class member." *Id*. at 1104.  The notice will be their primary, if not exclusive, source of information for deciding how to exercise their rights under Rule 23.  *Id*.

The notice must adequately describe the substantive claims and set forth information reasonably necessary to make a decision to remain a class member and be bound by the final judgment or to opt out. *Nissan*, 552 F.2d at 1104.  "The standard then is that the notice required by subdivision (c)(2) must contain information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class and be bound by the final judgment." *Id*. at 1105.  A notice that is confusing to class members is not the best notice practicable under the circumstances. *In re Domestic Air*, 141 F.R.D. at 553.

### a.  The Proposed Opt-Out Rights Are Both Misleading and Too Onerous.

CNX objects to the opt-out procedure presently contained in Plaintiffs' notice plan.  As a preliminary matter, Plaintiffs' notice plan states that class members can "[g]et out of these lawsuits," "[k]eep rights to sue independently," and "not be bound by any Court orders and []

16

keep your right to sue [] CNX on your own regarding the issues in these cases." Wheatman

Declaration (*Hale* 362-1) Ex. 4 at 1, 6; *see also* Wheatman Declaration Ex. 2. Nowhere does the

notice plan explain that class members *cannot opt out* of the claim that CNX "[i]mproperly

identified conflicting claims of CBM ownership between gas estate owners and coal estate

owners" (*see* Wheatman Declaration Ex. 4 at 3) because the Court certified the ownership claims

under Rule 23(b)(2) which is a mandatory, non-opt-out class. Without clearly explaining to class

members the nature of the claims and issues certified and what they can, and cannot opt out of,

the class notices violates Rule 23(c)(2)(B). As Dr. Wheatman explained in the Ethics in Class

Notice Article, when planning notice, "you must ask yourself: 'Is this what I would do if I really

wanted this class member to know his/her rights?' If you cannot answer 'yes,' your notice plan

is likely defective. It probably violates due process." 80 Tul. L. Rev. at 1783. Dr. Wheatman

testified at her deposition that Plaintiffs' counsel never informed her that there were mandatory

23(b)(2) claims that were certified. Exhibit 1, Dep. 202:22-203:5. She further testified that

where there are cases with mandatory 23(b)(2) claims the notice needs to clearly explain what

class members can and cannot opt out of. *Id.* at 222:19-22.

Furthermore, the opt-out procedure described in the notices is too onerous to be effective.

The notices require the class member who desires to opt-out to send a letter to be removed from

the class, identifying in the letter a "description of the property(ies) and wells/units involved (if

known)." Wheatman Declaration (*Hale* ECF 362-1) Ex. 4 at 6. A class member seeking to opt-

out should not be required to affirmatively write a letter to be excluded from this lawsuit that

must be mailed at his or her own expense. *See, e.g., McClintic v. Lithia Motors, Inc.*, No. C11-

859RAJ, 2012 WL 112211, at *6 (W.D. Wash. Jan. 12, 2012) (denying preliminary approval of

class action settlement, in part, because opt-out procedure was onerous as it required the class

17

member to print a form from the settlement website and mail it at his or her own expense to a settlement administrator).  One of the FJC Checklist's "Major Checkpoints" is: "Are all of the rights and options easy to act upon?  There should be no unnecessary hurdles that make it difficult for class members to exercise their rights to opt out, object, submit a claim, or make an appearance."  FJC Checklist at 1.  The present notice fails this test.  Instead, opt-out options should include the right to opt-out by phone, through a website, and/or by returning a prepared opt-out postcard that should be included with the individual mailings.  Here, Dr. Wheatman testified that her firm did not even determine what was to be in the opt out form and instead that this came from Plaintiffs.  Exhibit 1, Dep. 220:12-16.

### b.  The Proposed Notices Fail to Provide Significant Information About CNX's Defenses to the Claims Including CNX's Counterclaims.

On July 23, 2013, the Court granted CNX's motion for leave to amend its answer to file a counterclaim and add related affirmative defenses, over the opposition of Plaintiffs. On July 28, 2013, CNX filed its amended answer which included the defense that "Plaintiff's claims are limited by the doctrines of recoupment, credit, setoff, and monies had and received" as well as a counterclaim for "a credit, true-up, recoupment, set-off or reconciliation" for periods of time where "CNX's deductions for post-production costs were less than CNX was and is entitled to deduct."  Amended Answer (*Hale* ECF 286) at 31-32.  Plaintiffs' proposed class notice fails to inform class members that if they do not opt-out, the amount of royalties they may receive out of escrow may be less than amounts currently in escrow or their future royalties may be less. Plaintiffs' notice plan fails to mention this, or any other defense alleged by CNX.

The existence "of a counterclaim should be included in the notice as a factor for class members to consider in determining whether or not to exclude themselves from the class." *Nat'l Super Spuds, Inc. v. New York Mercantile Exch.*, 75 F.R.D. 40, 43-44 (S.D.N.Y. 1977); *see also*

18

*Serpa v. Jolly King Restaurants, Inc.*, No. 72-423-N, 1974 WL 941 (S.D. Cal. Mar. 29, 1974)

("Were a class action eventually declared, this decision would not preclude brief notice of

potential counterclaims to be included in the notice to class members."); *Donson Stores, Inc. v.*

*Am. Bakeries Co.*, 58 F.R.D. 485, 490 (S.D.N.Y. 1973) ("The [class action] notice should

contain appropriate mention of the entire scope of the case [including counterclaims]"). In these

cases the class members must be notified that if they do not opt-out of these cases, CNX's

counterclaims may reduce the amount they would receive out of the escrow accounts and could

also reduce the amount of royalties they receive on a going-forward basis.[10]

### c.   The Proposed Notices Fail to Provide Other Significant Information.

In addition to the specific issues identified above, there are other general deficiencies

with Plaintiffs' proposed notices.  The notices currently fail to mention the escrow accounts or to

explain that the lawsuits allege that Plaintiffs are entitled to the money that CNX has already

deposited into the Virginia state administered escrow account.  Instead, the notices misleadingly

suggest that they will not be charged for the lawyers in this case when in fact, *see* Wheatman

Declaration (*Hale* ECF 362-1) Ex. 4 at pageid #7527 ("You will not have to pay any of these

fees and out-of-pocket expenses"), counsel for the Plaintiffs intend to ask for a portion of the

royalties that CNX paid into escrow to be claimed by the rightful owner of the CBM, as well as

any additional money that they can prove is owed. *See* Transcript of June 7, 2011 hearing (*Hale*

ECF 108) at 57-58 (counsel for Plaintiffs acknowledged they would seek a fee on the money

coming out of escrow not a "big fee").  Class members should be notified that they have other

options to receive their money out of escrow.  To seek a release of royalties from escrow, class

---

[10] In *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 810 n.2 (1985), the Court suggested that a court's power to bind
absent class members without minimum contacts might depend on the fact that such class members were typically
not subject to counterclaims, cross-claims, or liability for fees and costs. *See also State v. Homeside Lending, Inc.*,
826 A.2d 997, 1018-20 (Vt. 2003) (holding class settlement not binding on state residents due to inadequate notice
and representation).

members can take advantage of the provisions of Va. Code Ann. § 45.1-361.22:1, including

arbitration or entering into an agreement with the other conflicting claimants in the unit, or filing

a declaratory judgment action in state court.

The notices also fail to:

- Identify that CNX only came into existence in 2001 and that the class members may have signed leases or otherwise dealt with Pocahontas Gas Partnership or Buchanan Production Company;
- Identify CNX's defense that it is allowed to deduct post-production costs under the express language of the operative pooling orders and leases; and
- Identify that the class members are in fact being sued by virtue of the counterclaims exerted by the coal owners and CNX.

Dr. Wheatman's conclusion that this is the best notice practicable under the

circumstances of these cases is merely a conclusory assertion of compliance in the language of

the rule without any persuasive evidence to the show that the actual requirements are met. *See*

Exhibit 1, Dep. 150:18-20

## V. The Proposed Coal Owner Notices are Nonsensical and Utterly Inconsistent With Plaintiffs' Arguments to Date in These Cases.

Finally, Plaintiffs' notice proposal includes the provision of a merely advisory notice to

the coal owners "in light of concerns raised by the Court regarding the potential impact of

Plaintiffs' pending Motions for Summary Judgment on Ownership to coal estate owners."

Notice Motions at 1.  To the extent that Plaintiffs now concede there will be an impact on the

property rights of conflicting coal owners, they should be joined to these cases as parties, and not

merely given an advisory notice that the litigation is going on.  Providing an advisory notice that

coal owners could "hire an attorney to represent you and/or request permission from the Court to

participate in these lawsuits" is insufficient to resolve the due process concerns with adjudicating

coal owner property rights in their absence. *See* Wheatman Declaration (*Hale* ECF 362-1)*,* Ex. 5

at 1.

Even assuming this notice was appropriate, there are similar deficiencies to those detailed above.  The notice again fails to explain that there is money currently sitting in escrow that belongs to the rightful owner of the CBM, and that the class seeks a judgment that they are entitled to that money already sitting in escrow and that the coal owner is not.  The notice again fails to provide any discussion of CNX's defenses or counterclaims, or note that there are counterclaims pending against the class by some coal owners who have intervened in these cases.

The plan for distribution of this notice is also insufficient for the same reasons identified above with respect to the gas owner notice.  If notice is going to be given, it must be given individually to all of the coal owners listed on CNX's filings with the Board and then also be updated to include current coal owners.  The same concerns regarding publication to only the seven counties for notice to the gas estate apply equally to the coal estate without any demographic or reach analysis.

Without explanation, the coal owner notice also repeatedly suggests that the coal owners must act immediately because the Court could act within 30 days of seeing the notice.  Presumably, Plaintiffs mean to suggest that this Court may issue an order on the summary judgment motions within 30 days of starting the notice program.  The 30 day timetable does not comport with Dr. Wheatman's testimony that her notice program was likely going to take two months to run.  Exhibit 1, Dep. 189:13-190:10. This timetable also ignores that under the proposed notice plan, individually mailed notices "that are returned as non-deliverable will be re-mailed to any address indicated by the postal service in the case of an expired automatic forwarding order" and that "[n]otices returned as non-deliverable, but for which a new address is

not indicated by the postal service, will be further searched through an alternate vendor to obtain a more current address." Wheatman Declaration (*Hale* ECF 362-1) ¶ 21.

Therefore, even if the Court decided 30 days was a sufficient amount of time to opt-out from the litigations, it would take more than 30 days to ensure that the individual notices had been mailed to the correct addresses. While the Notice Motions fail to include this information, Plaintiffs suggested to the Court during the March 12, 2014 hearing on the Motion to Stay that notice could be completed within 6-8 weeks after the Court order approving the notices. Plaintiffs do not support such a time period with any facts for the Court to judge such conclusory, unsubstantiated statements. Plaintiffs have not begun the effort to identify the class members as required in the certification order. Plaintiffs should be required to provide evidence to support the amount of time notice will take and the coal owner notice should be amended to reflect that the Court may rule within the actual amount of time it will take to provide notice under the approved plan. If notice is going to be given to the coal owners which advises them that they need to hire an attorney and try to intervene in these actions to have any rights, they obviously need more than 30 days to take all of these steps.

**VI.     This Court Should Not Enlarge the Scope of the Addison Class Definition.**

The Court's certified class definition in *Addison* limits the class membership to gas estate owners with voluntary leases who were identified as having a conflicting claim to CBM in filings with the Board. This definition excludes any voluntary lessors with conflicting CBM claims who were included in voluntarily pooled units. While CNX maintains that none of the Plaintiffs' classes should have been certified, the exclusion from the class definition of individuals who were voluntarily pooled is appropriate in light of the Rule 23 requirements.

The named Plaintiff, Ms. Addison, entered into a voluntary lease with one of CNX's predecessors and then was pooled under a Board order.  The CBM royalties allegedly attributable to Ms. Addison and the class members as currently defined are held in Virginia-state authorized and administered escrow accounts, with limited exceptions, for example, where funds are held in internal suspense accounts at CNX pending the creation of the escrow account or requisite Board orders allowing for payment into the escrow account.  In contrast, the voluntarily leased, voluntarily pooled individuals that Plaintiffs seek to add to the *Addison* class privately negotiated the rights and responsibilities with CNX or its predecessors.  There are no filings made with the Board and no order under the Virginia Gas and Oil Act (the "Act").  Instead, the individual leases with individual lease terms dictate the scope of the relationship between CNX and these proposed class members.  Furthermore, the funds at issue are not kept in escrow accounts but accounted for internally at CNX pursuant to the specific terms of those leases.

As a result of these differences, Ms. Addison is not typical or representative of the voluntarily pooled individuals who Plaintiffs seek to add into the certified classes nor have Plaintiffs provided any evidence to support the same.  Furthermore, Plaintiffs' failure to provide any analysis of the operative leases means that Plaintiffs have not met their burden to show that there is sufficient commonality between these proposed class members such that there would be common answers to their claims.  *See, e.g.,* CNX Opp. to Class Cert. (*Addison* ECF 145) at 28-30; CNX Objections to Class Certification Report and Recommendation (*Addison* ECF 212) at 49-51.

If the Court chooses to grant Plaintiffs' motion to amend the class definition in *Addison* to include these individuals, notice cannot be approved for the *Addison* class at this time.  Dr.

Wheatman testified at her deposition that she has not considered the demographics and geographic localities of these individuals.  *See* Exhibit 1, Dep. at 71:4-9.

**VII.    Class Notice is Premature.**

This Court should not approve a class notice mechanism now, or the specific language of Plaintiffs' proposed certification notices, for two reasons: (1) recent appellate developments in the Virginia Supreme Court and the U.S. Court of Appeals for the Fourth Circuit; and (2) undecided issues in this case that affect the class definitions.  While the Court denied CNX's motion to stay on these same grounds, CNX believes it would be appropriate to delay sending out these notices while the appeals are pending in an effort to provide clear and accurate information to the thousands of individuals who could be receiving class notice.  Even if Plaintiffs initially bear the cost of this notice and do not try to shift it to CNX at a later date, CNX has an interest, as does the Court, in only providing one notice to the class members and not providing multiple notices which could lead to confusion about the nature of the classes after the appeals are determined.

First, CNX filed petitions in the Fourth Circuit seeking permission to appeal this Court's class certification orders in the *Hale* and *Addison* cases in October of 2013.  On March 20, 2014, the Fourth Circuit issued an order calendaring these appeals for oral argument on May 13, 2014. In addition, on February 28, 2014, the Virginia Supreme Court awarded an appeal in *Swords Creek Land P'ship v. Belcher* (No. CL-1-000321).  The importance of this case was fully briefed before the Court in connection with the Joint Motion to Stay. *See* Joint Motion to Stay (*Hale* ECF 363). The issues presented for appeal in that case include whether or not the circuit court erred in concluding that the operative deed granting "coal and other things" did not include all of the property rights to the CBM.  The fact that the Virginia Supreme Court accepted this appeal

validates that conflicts continue to exist and that ownership issues cannot be decided without naming all required parties and examining the applicable severance deeds.  Class notice should not be issued until after these appeals have been decided because they have the potential to significantly alter to whom notice must be given and what the content of the notice must be.

Second, there are two undecided definitional issues pending before this Court that should be decided before the scope and content of class notice are determined.  The first is CNX's motion to amend the class definitions in *Hale* and *Addison* to exclude working interest owners, operators, and individuals involved in individual CBM litigations.  *See Hale* ECF 373; *Addison* ECF 296. The second is Plaintiffs' motion to enlarge the scope of the certified classes to include voluntary lessors who are part of voluntarily pooled units, with conflicting claims.  As set forth below, such an enlargement is not appropriate because the named plaintiffs are not representative of these individuals.  Regardless, these issues should be separately determined prior to the specifics of notice which will be shaped by the operative class definitions.

## CONCLUSION

Plaintiffs' notice plan fails to meet the minimum standards for due process articulated by the Federal Judicial Center guidelines, the Plaintiffs' own expert's prior writings, or what the Court contemplated in its certification order.  Implementing a plan such as this that fails to give adequate due process is likely futile.  The Court must require and decide on the front-end whether notice is sufficient, and not hope that on the back-end everything works out and due process is met.  The Court does not have the information necessary to project the likely effectiveness of the plan so there is equally no basis on which to determine whether the plan accomplished its objectives.

It is obvious that the plan never even contemplated individual notice to persons who could be identified with reasonable effort.  The plan lacks the indicia that that Federal Judicial Center and Dr. Wheatman have written characterize a good notice plan, and is infected with the defects identified in notice plans that do not satisfy due process.  It does not quantify coverage, is not targeted to class members, and is geographically insufficient.  18 Geo. J. Legal Ethics at 1375.  It lacks (1) the number of readily identifiable class members; (2) the anticipated class size; (3) the demographics of the class members and (4) the geographic location of the class members. It lacks the percentage of the class that will be exposed to a notice based on the plan, notices with all of the information required by Rule 23, does not spell out how notice will be accomplished, why the proposed methods were selected, or provide a detailed report explaining why individual notice will not be used. FJC Checklist at 1.  It does not contain an analysis of the makeup of the class, reach people wherever they may be located, and take into account where most class members reside.  *Id*., at 2.  It lacks the percentage to be reached by individual notice, and by all notice efforts together.  *Id*. at 3.  In fact, it lacks reach calculations entirely.  *Id*.

What is clear is that the FJC guidelines and the writings of Plaintiffs' expert are, for this plan, simply the roadmap for collateral attack on any judgment.  As a result, using this plan would permit what the class action rules are designed to avoid – one-way intervention.  *See Dep. Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 354 (1980).  Absent class members can await the result and if it is favorable, take advantage of it, and if unfavorable, simply assert the defective notice and lack of adequate representation to show they are not bound by the judgment.

If the class can be ascertained (which CNX continues to stand by its prior arguments on this point), then notice can be given in this case.  If possible, it is not easy, or inexpensive, but it is surely not what Plaintiffs have proposed thus far.

> Simply going through the motions for notice plan development and
> implementation amounts to a violation of due process. That is because satisfying
> due process in class action notice is based on intending to do the right thing when
> giving notice – a desire to actually inform the absent class member.

80 Tul. L. Rev. at 1806.

WHEREFORE, CNX Gas Company LLC, by its undersigned counsel, requests that this

Court require Plaintiffs to amend their notice proposal and class notices to resolve the

deficiencies set forth above, and for any such relief that this Court deems just and necessary.

Specifically, CNX asks the Court to make the following rulings:

- Plaintiffs should be required to give individual notice to all individuals listed as conflicting claimants with a gas ownership interest on any CNX filing with the Board, or any order of the Board that are not otherwise excluded by the class definitions;

- Plaintiffs should be required to give individual notice to all individuals who are ascertainable as current or former gas owners within the chain of title for all units where CNX identified conflicting claims that are not otherwise excluded by the class definitions;

- Plaintiffs should be required to provide a reach analysis to the Court estimating the number of class members that will receive notice;

- Publication notice must be expanded to include states where addresses were previously identified;

- Plaintiffs should amend the notice plan to allow a class member to opt-out by phone, website, or by returning a prepared post-card instead of affirmatively needing to write a letter;

- The content of the notices must be amended to include information clearly specifying what claims class members can and cannot opt out of;

- The content of the notices must be amended to include information about CNX and the coal owners' defenses and counterclaims;

- The content of the notices must be amended to include information about CNX's defense that it is allowed to deduct post-production costs under the express language of the operative pooling orders and leases and these cases may result in less money coming out of escrow or higher deductions in the future;

- The content of the notices must be amended to include information about the escrow accounts and the fact that CNX has already paid money into escrow accounts to be distributed to the rightful owner;

- The content of the notices must be amended to clarify that class members will bear the cost of attorney fees;

- The content of the notices must be amended to clarify that CNX only came into existence in 2001 and that the class members may have signed leases or otherwise dealt with Pocahontas Gas Partnership or Buchanan Production Company or other predecessor companies; and

- Plaintiffs' motion to enlarge the class definition in *Addison* should be denied.

Per CNX's Motion for Extension of Time to Respond to Plaintiffs' Motion for Approval of Class Notices and Notice Program and Amendment of Class Definition (*Hale* ECF 366), counsel met and conferred on April 2, 2014.  Counsel for Plaintiffs indicated that they would consider some of the items discussed after they reviewed this pleading

April 2, 2014                                           Respectfully submitted,

                                                        CNX GAS COMPANY LLC

                                                        By Counsel

                                                        /s/ Jonathan T. Blank
                                                        Jonathan T. Blank (VSB No. 38487)
                                                        Lisa M. Lorish (VSB No. 81465)
                                                        MCGUIREWOODS LLP
                                                        310 Fourth Street, N.E., Suite 300
                                                        P.O. Box 1288
                                                        Charlottesville, Virginia 22902
                                                        (434) 977-2509 – Telephone
                                                        (434) 980-2258 – Facsimile
                                                        *jblank@mcguirewoods.com*
                                                        *llorish@mcguirewoods.com*

                                                        James R. Creekmore (VSB No. 36246)
                                                        Blair N.C. Wood (VSB No. 81101)
                                                        THE CREEKMORE LAW FIRM PC
                                                        318 N. Main Street
                                                        Blacksburg, Virginia 24060
                                                        (540) 443-9350 – Telephone
                                                        (540) 443-9350 – Facsimile
                                                        *james@creekmorelaw.com*
                                                        *blair@creekmorelaw.com*

                                                        *Counsel for CNX Gas Company LLC*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 2, 2014 a true and correct copy of the foregoing instrument was sent to all counsel of record registered to receive filings via ECF.


<u>/s/ Jonathan T. Blank</u>
Jonathan T. Blank (VSB No. 38487)
Lisa M. Lorish (VSB No. 81465)
MCGUIREWOODS LLP
310 Fourth Street, N.E., Suite 300
P.O. Box 1288
Charlottesville, Virginia 22902
(434) 977-2509 – Telephone
(434) 980-2258 – Facsimile
*jblank@mcguirewoods.com*
*llorish@mcguirewoods.com*

James R. Creekmore (VSB No. 36246)
Blair N.C. Wood (VSB No. 81101)
THE CREEKMORE LAW FIRM PC
318 N. Main Street
Blacksburg, Virginia 24060
(540) 443-9350 – Telephone
(540) 443-9350 – Facsimile
*james@creekmorelaw.com*
*blair@creekmorelaw.com*

*Counsel for CNX Gas Company LLC*

29